691 So.2d 1316 (1997)
DIXIE PARKING SERVICE, INC.
v.
Amy HARGROVE.
No. 96-CA-1929.
Court of Appeal of Louisiana, Fourth Circuit.
March 26, 1997.
*1317 John V. Baus, Jr., David S. Daly, Hammett & Baus, New Orleans, for Plaintiff/Appellee.
William M. McGoey, Reinhardt & McGoey, Metairie, for Defendant/Appellant.
Before CIACCIO, JONES and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
Dixie Parking Service, Inc. (Dixie) filed suit against its former employee, Amy Hargrove seeking to enforce provisions of a noncompetitive agreement entered into by Hargrove. On 17 January 1996, the trial court granted a preliminary injunction enforcing the contract. Following a full hearing on 26 February 1996 at which testimony was taken, the trial court granted a permanent injunction on 20 March 1996 prohibiting Hargrove from engaging in or being employed by Southern Parking Systems, or any other automobile parking and parking management business located within the Louisiana parishes of Orleans and Jefferson, for a period of two years from 28 August 1995, the date of Hargrove's resignation from Dixie; soliciting or contacting Dixie clients for a like period, and divulging to any person at any time any financial or proprietary information, or trade secrets gained from her employment with Dixie. Hargrove appeals that judgment, and we affirm.

STATEMENT OF FACTS
Hargrove first began working for Dixie as a cashier in 1984. She was promoted successively to attendant, flat lot supervisor and zone manager/facility manager. Hargrove testified that during the six years that she was a Dixie manager, she received instruction and training in Dixie's parking procedures, their management philosophies and techniques. In late 1992, Dixie began to initiate changes in its business procedures designed to increase efficiency and profitability and to increase the income of its managers and employees through an incentive profit-sharing bonus program. According to the testimony of Hargrove and James Huger, Dixie's president, under this program Dixie provided to its managers certain critical, confidential financial information. Huger testified that this information included revenue, payroll, expenses and rents relating to the operations they managed. Revenue information included daily and monthly parking receipts and budget figures. Because of the highly competitive nature of the parking business, with many locations operating on short-term leases, a competitor's knowledge of rental agreements enables the competitor to offer minimally higher rent to the landlord to obtain favorable locations. Hargrove admitted that she had access to this financial information for over half of Dixie's properties.
Huger testified that the dissemination of the critical information to his employees subjected the company to competitive disadvantage were the employees to resign and go to work for Dixie's competitors, and, in order to mitigate that threat, he was advised to make non-competitive agreements an integral part of the incentive profit-sharing bonus program. In November, 1992, all managers as well as other Dixie employees who had access to financial information were required to sign agreements limiting competition in order *1318 to protect the business against unfair competition arising from the managers' potential use of Dixie's sensitive, proprietary information. The agreement was explained to the employees and, according to uncontroverted testimony by Huger and confirmed by employee Jerrald Pierre, employees were advised that they could take the agreement to their attorneys and bring it back within a few days for signature.
On 26 November 1992, Hargrove signed a contract entitled "Non-Competition Agreement" in which she acknowledged that the services she would render to Dixie were of a special and unusual character with a unique value to Dixie, the loss of which cannot be compensated adequately by damages in a legal action. As a material inducement to Dixie to continue to employ Hargrove, she agreed, inter alia, neither directly or indirectly to own, manage, operate, control, be employed by or participate in the ownership, management, operation or control of, or be connected in any way with any automobile parking and parking management business of the type and character engaged in and competitive with that conducted by Dixie. The covenant not to compete was limited to a two year period beginning with Hargrove's termination of employment with Dixie and continuing for two years. The covenant was further limited to the Louisiana parishes set forth in a schedule attached to the Non-Competition Agreement, and within any parishes in which Dixie conducted business at the time of Hargrove's termination. In the agreement, Hargrove acknowledged the reasonableness of the provisions, and agreed that the provisions of the agreement are severable, and that the invalidity or unenforceability of any one or more of the provisions shall not affect the validity and enforceability of the remaining provisions. Hargrove further agreed that Dixie's breach of any obligation owed her would not affect the validity or enforceability of the agreement. The Exhibit listed Orleans, Jefferson and nine other Louisiana parishes; however, Huger testified that Dixie did not implement its plan to operate in the nine other parishes, and Dixie sought to limit Hargrove's competitive employment only in Orleans and Jefferson parishes.
Hargrove admitted that she signed the agreement in order to gain access to confidential information that would enable her to earn substantial bonuses as a Dixie employee. In fact, Hargrove earned substantial bonuses through the remainder of her career with Dixie.
In 1993, Hargrove was promoted in the managerial hierarchy to the position of facility manager. In February, 1995, Dixie instituted a company-wide reorganization whereby an additional level of management was installed. Three new zone managers were hired, and Hargrove and the other zone managers received new titles as shift managers. Their base salaries remained the same and they were still eligible for the profit-sharing bonus program, but they lost their health care benefits. Hargrove testified that her bonuses decreased under the new plan, but admitted that she was offered two promotions during that time which would have raised her salary, but she refused because she did not want the added responsibilities associated with the promotions. Huger testified that he offered Hargrove these opportunities to increase her compensation when he learned she was dissatisfied with the reorganization. Hargrove admitted that in her new position she retained access to Dixie's revenue and payroll information. Huger testified that in her new position Hargrove had the same access to information and was doing the same job as before, but now reported to a different person. Hargrove resigned without any prior notice on August 25, 1996, and immediately went to work as a zone manager for Southern Parking, who, Hargrove admitted, was Dixie's direct competitor.
Hargrove admitted that Southern solicited her to come to work for them. She testified that she applied for her position with Southern in September, 1995, after she resigned from Dixie on 28 August 1995, and denied that she applied before having resigned. Her application for employment, however, clearly shows that she applied on 15 August, two weeks prior to her resignation. She admitted that she knew she had a job at Southern before she applied. She testified that she began work on 6 or 7 September 1995; however, in her application for unemployment *1319 insurance she gave 28 August 1995 as the date she began to work for Southern. Hargrove was also confronted on cross-examination with a Southern document requesting information about any criminal history, which was signed by Hargrove and dated 28 August 1995. This document and the employment application dated 15 August 1995 impeach Hargrove's testimony that she did not apply for a position with Southern until 6 or 7 September 1995.
Hargrove admitted that she had access to critical financial and managerial information concerning two lots she managed for Dixie, the Central garage in the French Quarter and one near the Saratoga Building, that were engaged in direct competition with adjacent Southern parking facilities. Hargrove testified that she had primary supervisory responsibility for Dixie's Central garage in the French Quarter, and that Southern was trying to acquire that property. She admitted that when she left Dixie she took with her Dixie's organizational chart, containing the names of all Dixie's managers. She testified that she didn't take any other written documents because the chart was all she needed. Hargrove also admitted that Southern doesn't train its managers, but hires them from Dixie. Huger testified that Dixie's former general manager, whom Dixie had terminated, previously found a position with Southern and systematically worked to hire Dixie's employees and to acquire Dixie's locations for Southern. Approximately 10 to 15 Dixie trained employees had been hired away and Dixie lost several locations to Southern in this process.
Hargrove testified that she was aware of the non-competitive agreement she had executed with Dixie and had advised Southern of its terms. She also testified that her attorneys fees and costs were being advanced by Southern, and admitted that she had no written agreement to repay Southern for these expenses.
Huger testified that during the eleven year course of Hargrove's career with Dixie, Dixie provided extensive training and gave her access to trade secrets, financial information and management techniques employed by Dixie. He testified that Hargrove, of all Dixie's managers, had access to more financial information than anyone except Dixie's general manager because of her wide range of duties at various locations during her eleven year career. She had worked at about 80 percent of Dixie's locations and had access to their financial information.
Jerrald Pierre testified that he held a similar position to Hargrove's with Dixie, and in February 1995, when he was managing the Clark and Saratoga lots for Dixie, was solicited by Southern. The Southern representative also questioned him concerning Dixie's payroll policies. He told his supervisor and Huger that he had received a better offer from Southern, whereupon Huger and Pierre's supervisor advised him that they would enforce the non-competitive agreement Pierre had signed. Pierre decided to honor his agreement, and remained with Dixie. He testified that he was not penalized by Dixie and has been promoted subsequently. He now serves as director of human resources.

STANDARD OF REVIEW
Before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts[1], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745.
As a reviewing court, we must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). Where there *1320 are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong, and when findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings. Where, as here, a factfinder's judgment is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-845 (La. 1989).
ASSIGNMENT OF ERROR: The trial court committed reversible error by enforcing an unenforceable no-competition agreement.
Louisiana has a strong public policy against non-competition contracts prohibiting an employee from competing with a former employer. Public policy requires that noncompetition covenants are to be strictly construed in the employee's favor. Cellular One, Inc. v. Boyd, 94-1783 and 94-1784 (La. App. 1 Cir. 3/3/95), 653 So.2d 30, 33; writ denied, 95-1367 (La.9/15/95), 660 So.2d 449.
La. R.S. 23:921(A) provides that although every agreement to restrain anyone from exercising a lawful profession, trade, or business of any kind shall be null and void, any employee may agree with the employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of the contract. La. R.S. 23:921(C); Water Processing Technologies, Inc. v. Ridgeway, 93-0264 (La.App. 4 Cir. 4/28/93), 618 So.2d 533, 536. An agreement limiting competition must strictly comply with the requirements of the statute. Comet Industries, Inc. v. Lawrence, 23,554 (La.App. 2 Cir. 5/13/92), 600 So.2d 85, writ denied, 92-1683 (La.9/25/92), 604 So.2d 1002.
The agreement at issue herein is properly limited to two years from Hargrove's resignation. The evidence is uncontroverted that Hargrove resigned in order to work for Southern, Dixie's competitor, in the Parish of Orleans. Huger testified that Dixie sought to enforce the agreement only as to Orleans and Jefferson Parishes, where Dixie operated at the time of Hargrove's resignation. The fact that the exhibit setting forth those parishes in which Dixie was operating lists additional parishes is not fatal to its enforcement in Orleans and Jefferson parishes. Even were we to accept Hargrove's argument that the listing is overbroad and appears to allow Dixie to amend the contract at the time of termination to add other parishes in which it might be doing business, the fact remains that Dixie did not exercise that right. Further, the severability clause in the agreement specifically addresses the issue of enforceability and, were this Court to agree with Hargrove's interpretation of the geographical limitation language contained in the agreement, the severability clause would allow us to delete the nine extraneous parishes listed in the exhibit and apply the reformed contract to those parishes, Jefferson and Orleans, in which Dixie currently operates. The Louisiana Supreme Court recently applied a severability clause to strike nonenforceable provisions of a non-competitive agreement. Amcom of Louisiana, Inc. v. Battson, 96-0319 (La.3/29/96), 670 So.2d 1223.
In Amcom, the geographical limitations of the non-competitive agreement included "any other radio station or competitor of AMCOM located in Shreveport or Bossier City, Louisiana, or in Caddo or Bossier Parishes, Louisiana, or within a seventy-five (75) mile radius of Shreveport or Bossier City, Louisiana." The trial court found the 75 mile radius provision overly broad because it might have included parts of parishes or municipalities in Louisiana and perhaps Texas or Arkansas which were not stated in the agreement. However, the lower court found that it could strike the offending clause and reform the contract to enforce the remaining geographical limits. On appeal, the Second Circuit reversed the trial court, finding that a "savings clause" would not be sufficient to allow the court to reform an invalid non-competition agreement to the geographic area permitted by La. R.S. 23:921. Amcom of Louisiana, Inc. v. Battson, 28,171 (La.App. 2 Cir. 1/5/96), 666 So.2d 1227, writ granted, rev'd 96-0319 (La.3/29/96), 670 So.2d 1223. The *1321 Supreme Court granted writs, reversed the Second Circuit's ruling, and reinstated the trial court's judgment. Id. The operative facts of the instant case are clearly analogous to Amcom and support the trial court's reformation of Hargrove's contract, limiting enforceability to Orleans and Jefferson Parishes.
Hargrove claims that even if the agreement is enforceable, her "demotion" made the agreement unenforceable; however, she introduced no evidence that the consideration for the contract was no longer valid. Indeed, she admitted that she retained access to revenue and payroll information critical to Dixie's operations and of great value to its competitor, and was a participant in Dixie's profit-sharing bonus plan, the quid pro quo or consideration for the agreement not to compete.
Accordingly, we find the Dixie non-competitive agreement valid and enforceable against Amy Hargrove. We find further that its severability provisions eliminate any arguably overbroad geographical limitations. Therefore we affirm the judgment of the trial court.
AFFIRMED.
JONES, J., dissents.
NOTES
[1] See, LSA-Const. Art. 5, section 10(B).