809 So.2d 405 (2001)
Baylen G. KIMBALL, M.D.
v.
ANESTHESIA SPECIALISTS OF BATON ROUGE, INC. (A Professional Medical Corporation); Fahimeh H. Tahvildari, M.D.; Mark M. Walker, M.D.; Ali Zarbalian, M.D.; and Mary E. Corry, M.D.
No. 2000 CA 1954.
Court of Appeal of Louisiana, First Circuit.
September 28, 2001.
Writs Denied March 8, 2002.
*406 Phillip W. Preis, Baton Rouge, Counsel for Plaintiff/Appellant/Appellee Baylen G. Kimball, M.D.
*407 Stewart E. Niles, Jr., New Orleans, Counsel for Defendants/Appellees/Appellants Anesthesia Specialists of Baton Rouge, Inc. (A Professional Medical Corporation); Fahimeh H. Tahvildari, M.D.; Mark M. Walker, M.D.; Ali Zarbalian, M.D.; and Mary E. Corry, M.D.
Before: FOGG, PARRO, and WEIMER, JJ.
WEIMER, Judge.
Dr. Baylen Kimball, an anesthesiologist who was a former employee and also a shareholder of Anesthesia Specialists of Baton Rouge, Inc. (A Professional Medical Corporation) (ASBRI), filed suit against the corporation and the individual doctors/shareholders of the corporation following his termination from employment. Both sides appeal various judgments rendered during the course of these proceedings.

BACKGROUND
Dr. Kimball was one of the founding members of ASBRI when it was incorporated in August of 1986. The corporation successfully negotiated a contract with Woman's Hospital in Baton Rouge to provide anesthesia services at the hospital beginning in 1986. The contract proved to be an extremely valuable corporate asset allowing ASBRI to achieve a high degree of profitability with the individual doctors/shareholders receiving substantial compensation.
On March 1, 1991, Dr. Kimball along with the other doctors/shareholders of the corporation executed a new employment agreement with ASBRI for a period of one year, renewable automatically for successive one-year-periods unless and until terminated as provided in the contract. This contract governed the actions and responsibilities of the doctors as employees of the corporation. The employment agreement included provisions dealing with purpose and employment; performance and duties; compensation; benefits; working facilities and expenses; sickness, disability and death benefits; term and termination of the agreement; a covenant not to compete; and miscellaneous provisions. The relevant portions of the employment agreement as it relates to this case involve the terms of employment, the termination of the agreement, and the covenant not to compete.
At the time Dr. Kimball and ASBRI executed the employment agreement, ASBRI and the doctors/shareholders also executed an "Amended and Restated Agreement to Purchase and Sell Stock" (stock buy/sell agreement). This contract governed the relationship between the doctors as shareholders of the corporation and the corporation. Among other matters, the stock buy/sell agreement listed the procedure for the transfer of ASBRI stock and the methodology for calculating the value of the stock if a doctor/shareholder's employment with ASBRI was terminated.
At the time the original agreement to purchase and sell stock was executed on April 30, 1987, corporate ownership was shared by seven doctors. At the time the amended stock buy/sell agreement was executed, corporate ownership was shared by six doctors, five of whom had executed the original agreement. Dr. Kimball executed both the original and amended agreement.[1]
The record reflects that on August 5, 1991, ASBRI executed an agreement with Woman's Hospital Foundation for operation *408 of a section of anesthesiology. The agreement was for a term of three years, renewable for additional terms of one year each following the initial term. Either party had the right to terminate the agreement, with or without cause, upon giving the other party six months written notice.
On November 7, 1991, Dr. Kimball was terminated as an employee of the corporation. Following the termination, Dr. Kimball continued to work at Woman's Hospital in spite of the covenant not to compete included in the employment agreement. The transfer of stock pursuant to the stock buy/sell agreement did not take place as provided in the agreement.
Dr. Kimball filed suit against the corporation and the individual doctors/shareholders on January 8, 1992, seeking damages and a declaratory judgment against ASBRI and four doctors individually. The numerous causes of action which Dr. Kimball alleged following his termination as an employee were further complicated by the fact that he was also a shareholder of the corporation.[2]
Defendants answered and filed a reconventional demand alleging that Dr. Kimball had violated provisions of the employment agreement, specifically the provisions of Article II regarding the performance of his duties as an employee of ASBRI (failure to perform duties exclusively for the corporation, including the prohibition of performing professional services for or on behalf of himself or another party without the express written consent of ASBRI) and Article VIII regarding the non-compete agreement effective upon termination of the employment agreement for any reason. Defendants sought attorney fees and costs associated with the litigation, specific performance of Section 8.02 (the forfeiture clause), and all damages and attorney fees for groundless and bad faith claims under the Unfair Trade Practices and Consumer Protection Act.[3]
Since the time of the filing of the original petition and reconventional demand, there have been innumerable motions, exceptions, reconventional demands and counter claims. There were motions for summary judgment and cross motions for summary judgment. Some were certified as final judgments and appealed to this court.[4]
*409 The matter was tried before a jury on January 24-28, 31, and February 1-4, 7-11, 14-15, 2000. A unanimous jury rendered a verdict in favor of the defendants against Dr. Kimball ordering that the employment agreement be reformed to read that termination from employment could be "with or without cause"; the claims and causes of action by Dr. Kimball against the corporation be dismissed; Dr. Kimball tender his shares of stock in ASBRI to the corporation and ASBRI pay Dr. Kimball the sum of $34,724.56 for the stock; and Dr. Kimball pay to ASBRI the sum of $16,923.82 plus judicial interest for damages due pursuant to the reconventional demand for breach of the employment contract. Judgment in accordance with the jury verdict was signed on March 6, 2000.[5]
Dr. Kimball filed a motion for judgment notwithstanding the verdict and, in the alternative, a motion for a new trial which were heard on March 27, 2000. Those motions were denied with prejudice in a judgment signed on April 6, 2000. Dr. Kimball filed a motion and order for a suspensive appeal of the March 6, 2000 judgment rendered pursuant to the jury verdict and the judgment signed on April 6, 2000, denying with prejudice the motion for a judgment notwithstanding the verdict and, alternatively, a motion for a new trial. Dr. Kimball complains about a plethora of issues, listing some sixteen assignments of error.[6]
The case was complicated and confusing to try because of the numerous causes of action, some of which overlapped, and because of numerous rulings that the trial court was called upon to make throughout the course of the litigation.
Also before this court is a devolutive appeal filed by plaintiffs-in-reconvention, ASBRI and the individual doctors/shareholders, contesting a judgment dated March 17, 2000, which granted the motion for directed verdict by Dr. Kimball and dismissed all claims and causes of actions against Dr. Kimball except those set forth or included in the judgment rendered by the court on March 6, 2000.

VALIDITY OF COVENANT NOT TO COMPETE[7]
Defendants have appealed a grant of a motion for summary judgment based on a conclusion by the trial court that the non-compete clause in the employment agreement was unenforceable because the *410 clause failed to include "a specified parish or parishes, municipality or municipalities, or parts thereof" as required by LSA-R.S. 23:921(C).[8] The defendants contend the clause was enforceable because the evidence established that the medical facilities referenced in the non-compete clause were identifiable and within East Baton Rouge Parish.
As stated in the recent case of SWAT 24 Shreveport Bossier, Inc. v. Bond, 00-1695, pp. 4-6 (La.6/29/01), 808 So.2d 294, 296-297:
Louisiana has long had a strong public policy disfavoring noncompetition agreements between employers and employees. Louisiana Smoked Products, Inc. v. Savoie's Sausage & Food Products, 96-1716, p. 11 (La.7/1/97), 696 So.2d 1373, 1379. Thus, the longstanding public policy of Louisiana has been to prohibit or severely restrict such agreements. Id. This public policy is expressed in La. R.S. 23:921(A)(1), which provides:
Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.
Louisiana's strong public policy restricting these types of agreements is based upon an underlying state desire to prevent an individual from contractually depriving himself of the ability to support himself and consequently becoming a public burden. See McAlpine v. McAlpine, 94-1594, p. 11 (La.9/5/96), 679 So.2d 85, 91. Because such covenants are in derogation of common right, they must be strictly construed against the party seeking their enforcement. Hirsh v. Miller, 249 La. 489, 187 So.2d 709, 714 (1966); Turner Professional Services, Ltd. v. Broussard, 99-2838, p. 3 (La. App. 1 Cir. 5/12/00), 762 So.2d 184, 185[, writ denied, 00-1717 (9/29/00), 770 So.2d 356].
The exceptions to this provision are specifically enumerated by the statute and provide for employer/employee relationships, corporation/shareholder relationships, partnership/partner relationships and franchise/franchisee relationships. The statute defines the limited circumstances under which a noncompetition clause may be valid in the context of each of these relationships. The exception at issue in the instant case is provided for by Subsection (C), which reads:
Any person, including a corporation and the individual shareholders of such corporation, who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to *411 exceed a period of two years from termination of employment.
La. R.S. 23:921(C)[.] [Emphasis in original omitted.][9]
The issue presented to this court is whether the failure to specify the parishes, municipalities, or parts thereof in the non-compete clause included in the employment agreement between Dr. Kimball and ASBRI is fatal to the enforceability of the clause. The non-compete clause contained within the employment agreement provides, in part, as follows:
8.01 Upon the termination of this Agreement, for any reason whatsoever, Physician agrees not to practice anesthesiology in any health care facility regularly serviced by the Corporation during the term of this Agreement. This covenant not to compete shall be in full force and effect for a period of two (2) years commencing on the date this Agreement is terminated.
An agreement limiting competition must strictly comply with the requirements of LSA-R.S. 23:921. LaFourche Speech & Language Services, Inc. v. Juckett, 94-1809, p. 3 (La.App. 1 Cir. 3/3/95), 652 So.2d 679, 680, writ denied, 95-0850 (5/12/95), 654 So.2d 351. We must strictly construe statutory exceptions, such as LSA-R.S. 23:921(C), because of the "longstanding public policy of this state disfavoring agreements not to compete." SWAT 24, 00-1695 at 18, 808 So.2d at 300. Although evaluating a different issue relative to a non-compete agreement, the supreme court in SWAT 24, 00-1695 at 17 and 5, at 305 and 298, noted that the "public policy disfavoring such agreements remains strong" and also noted its longstanding rule that "[b]ecause [non-compete] covenants are in derogation of the common right, they must be strictly construed against the party seeking their enforcement."[10] Thus, both the non-compete clause itself and the exception contained in LSA-R.S. 23:921(C) must be strictly construed.
We specifically note that in SWAT 24 the supreme court cited Turner Professional Services, Ltd. when indicating the applicability of a rule of strict construction. SWAT 24, 00-1695 at 5, at 298. In Turner Professional Services, Ltd., this court determined that where a non-compete clause in an employment agreement failed to specify the "parish or parishes, municipality or municipalities, or parts thereof" as required by LSA-R.S. 23:921(C), the clause was unenforceable. Turner Professional Services, Ltd., 99-2838 at 3, 762 So.2d at 185. See Cellular One, Inc. v. Boyd, 94-1783, 94-1784, p. 1 (La.App. 1 Cir. 3/3/95), 653 So.2d 30, 36 (Shortess, J., dissenting), writ denied, 95-1367 (9/15/95), 660 So.2d 449; see also Water Processing Technologies, Inc. v. Ridgeway, 618 So.2d 533, 536 (La.App. 4 Cir.1993), which stated:
[T]hat limitation [imposed on an employee pursuant to a non-compete clause] may occur only in a restricted geographical area, "a specified parish or parishes, municipality or municipalities, or parts thereof," ....

*412 We find that the non-competition clause included in the Distributorship Agreement fails to comply with the exception to the general prohibition described in § 23:921C. Although the [statutory] exception requires that the territorial limits for non-competition be specified, the clause in this agreement does not do so. While limits may be inferred from the limits of the Distributorship Agreement itself, we decline to reform the non-competition clause in favor of the employer.
The fourth circuit in Medivision, Inc. v. Germer, 617 So.2d 69, 72-73 (La.App. 4 Cir.), writ denied, 619 So.2d 549 (1993), considered a non-compete clause which referred to the employer's health care sites. The non-compete clause in the medical services agreement prevented a doctor:
from "providing ophthalmological services at any location within ten miles of any office of the [eye care] Center existing during the term of this agreement." In the preamble to the Medical Service Agreement, the term "Center" is defined as "an eye care center currently located at 3434 Houma Boulevard, Metairie, Louisiana (collectively with the Meadowcrest Office [located in Gretna, Louisiana]) and any future additional offices in the Greater New Orleans Area."
Medivision, Inc., 617 So.2d at 72. The fourth circuit held the clause was invalid because the uncertainty as to the extent of the territorial limitations was in violation of LSA-R.S. 23:921. Medivision, Inc., 617 So.2d at 73. See Daiquiri's III On Bourbon, Ltd. v. Wandfluh, 608 So.2d 222, 224 (La.App. 5 Cir.1992), writ denied, 610 So.2d 801 (1993) (a non-competition agreement which contained no territorial limitation whatsoever was found to be null and void pursuant to the requirements of LSA-R.S. 23:921(C)); Comet Industries, Inc. v. Lawrence, 600 So.2d 85, 87 (La.App. 2 Cir.), writ denied, 604 So.2d 1002 (1992) (an agreement which purported to prohibit the employee from competing against the employer "anywhere within the continental United States" was found to be unenforceable as written since it failed to specify the "parish or parishes, municipality or municipalities, or parts thereof" wherein the employer carried on like business, as required by LSA-R.S. 23:921(C)).
In sum, LSA-R.S. 23:921(C) requires that the parish or parishes, municipality or municipalities, or parts thereof be "specified." When this requirement is "combined with the principle that we must strictly construe the exceptions to the longstanding public policy of this state disfavoring agreements not to compete,"[11] we are obligated to find that the non-compete clause at issue in this case is unenforceable because it failed to conform to LSA-R.S. 23:921(C).
We note our colleagues on the third circuit approved a non-compete clause where the affected parishes are identifiable although not specified in the clause. See Petroleum Helicopters, Inc. v. Untereker, 98-1816 (La.App. 3 Cir. 3/31/99), 731 So.2d 965, writ denied, 99-1739 (8/5/99), 747 So.2d 40.[12] This court specifically declined *413 to follow Petroleum Helicopters, Inc. in Turner Professional Services, Ltd.[13]Turner Professional Services, Ltd., 762 So.2d at 186.
The defendants contend Turner Professional Services, Ltd. is distinguishable from this matter because in Turner Professional Services, Ltd. there was no severability (or savings) clause as there is in the employment agreement under consideration. The employment agreement provides, in part:
9.03 If any provision, term or condition of this Agreement is found to be invalid under any applicable law, the remaining provisions, terms and conditions of this Agreement which are not invalid shall remain in full force and effect and shall be binding upon the parties hereto.
This clause provides that if a contractual provision is invalid, the balance of the agreement shall remain binding. Similar clauses have been used to strike portions of non-compete agreements which were overly broad. See, e.g., AMCOM of Louisiana, Incorporated v. Battson, 96-0319 (La.3/29/96), 670 So.2d 1223. However, in AMCOM of Louisiana, Incorporated, the non-compete clause contained a valid localized restriction, but an invalid overbroad geographic limitation which lent itself to severance. See AMCOM of Louisiana, Incorporated v. Battson, 28,171 (La.App. 2 1/5/96), 666 So.2d 1227, 1228-1229.
In this matter, there is a failure to include specified geographic areas as statutorily required. We cannot simply rewrite the non-compete clause so as to make it comply with the statute.[14] Also, because LSA-R.S. 23:921 requires specificity regarding geographical limitations, the non-compete clause must stand on its own. Reformation by parole evidence would violate the requirement of strict construction which must be applied to a non-compete clause. See Turner Professional Services, Ltd., 99-2838 at 3, 762 So.2d at 185.
ASBRI contends the non-compete clause is not applicable in this matter because Dr. Kimball was not only an employee but also a shareholder; ASBRI cites Hawthorn, Waymouth & Carroll v. Johnson, 611 So.2d 645 (La.App. 1 Cir.1992) (which involved the departure of a partner, as opposed to an employee, from an accounting firm), and Louisiana Smoked Products, Inc., 96-1716 at 11-12, 696 So.2d at 1379-1380 (which involved competing corporations). Neither case applies to the facts of this matter. The non-compete clause in this matter was contained within an employment contract, and Dr. Kimball signed this agreement as an employee, not as a shareholder. Additionally, the Hawthorn, Waymouth & Carroll case involved a contract of partnership which included an agreement not to compete. The provisions of LSA-R.S. 23:921 prior to its revision by Louisiana Acts 1989, No. 639 were considered by the court, but deemed not to apply to the situation addressed in the case. The court found the statute prohibited a non-compete agreement within an *414 employer/employee contract, not a partnership agreement.[15]Hawthorn, Waymouth & Carroll, 611 So.2d at 653-654
Lastly, the defendants claim that Dr. Kimball was involved in drafting the employment agreement and the non-compete clause and, as such, it would be inappropriate to allow him to take advantage of its failure to comply with statutory requirements. Although there is evidence Dr. Kimball worked with the corporate attorney for ASBRI in preparing the non-compete agreement, there was no evidence it was his responsibility to make the clause statutorily compliant.[16]

THE ACCOUNTS RECEIVABLE ISSUE
The employment agreement provides, in part:
7.05 (a) In the event this Agreement is terminated, for any reason whatsoever, Physician shall be entitled to receive the compensation which he is entitled to under Article III of this Agreement through the last day of his employment. Furthermore, Physician shall receive a severance payment equal to Physician's "applicable fraction" of eighty-four (84%) percent of those accounts receivable of the Corporation which have had payment activity over the last six (6) months or which are not yet six (6) months old as of the last day of the calendar month immediately prior to the date of Physician's termination of employment. For purposes of this Agreement, Physician's "applicable fraction" shall be a fraction the numerator of which is one (1) and the denominator of which is five (5) up to and including $1,034,186 and six (6) for the amount in excess of $1,034,186."
The jury, in response to a jury interrogatory, determined Dr. Kimball was not entitled to any compensation for the accounts receivable as provided for in the above quoted section of the contract.
Following the trial, in ruling on a motion for judgment notwithstanding the verdict and, in the alternative, for a new trial, the trial court stated the following regarding the jury's denial of Dr. Kimball's accounts receivable claim:
THE COURT HAD PREVIOUSLY RULED THAT THE NONCOMPETE CLAUSE OF THE [EMPLOYMENT AGREEMENT] UNDER [SECTIONS] 8.1 AND 8.2 WAS NOT ENFORCEABLE... ON THE REFORMATION OF THE NONCOMPETE [CLAUSE,] THE COURT FELT THAT THAT WAS A VERY, VERY CLOSE CALL, BUT FELT THAT UNDER [LSA-R.S. 23:921] THAT THE NONCOMPETE CLAUSE WAS NONENFORCEABLE.[17] THE COURT THROUGH THE PROCESS OF THE TRIAL REFUSED TO GIVE THE JURY INSTRUCTIONS SAYING THAT IT FOUND THAT ENFORCEABLE OR NONENFORCEABLE, REFUSED TO GIVE THAT INQUIRY TO THE JURY. THE COURTIN MY MIND I HAVE ABSOLUTELY NO DOUBT THE REASON WHY [THE JURY] *415 DID NOT AWARD DR. KIMBALL THE COMPENSATION [FOR ACCOUNTS RECEIVABLE] UNDER THE CONTRACT WAS BASED UPON THE FACT THAT THEY READ THE NONCOMPETE CLAUSE, FOUND THAT DR. KIMBALL HAD VIOLATED IT AND DIDN'T GIVE HIM ANY MONEY BECAUSE OF IT. SO THEY, IN ESSENCE, SORT OF REVERSED WHAT I HAD FOUND. AND I THINK THAT'S CLEARLYAND MY THOUGHT PROCESS WAS, WELL, UNDER THOSE CIRCUMSTANCE[S] THEN I PROBABLY OUGHT TO GO AHEAD AND REINSTATE THE AMOUNT FOR THE ACCOUNTS RECEIVABLE. BUT SINCE THIS IS SUCH A CLOSE CALL, SINCE THE JURY DISAGREED WITH WHAT I FOUND, I THINK THAT THE COURT OF APPEAL OUGHT TO REVIEW IT. SO I'M GOING TO DENY THE MOTION FOR A NEW TRIAL ON THAT ISSUE.
Section 8.02 of the employment contract contains a forfeiture clause, which provides:
In the event Physician violates this covenant not to compete, the Corporation shall be under no further obligation to pay Physician any of the amounts required to be paid under the provisions, terms and conditions of this Agreement and shall be entitled to any and all other relief provided by law including, but not limited to, specific performance.
Thus, although the trial court determined that the covenant not to compete was unenforceable, the jury was not made aware of this finding. Based on our review of the record and evaluation of the employment contract, we are convinced that the jury could only deny Dr. Kimball's accounts receivable claim based on an application of the above quoted forfeiture clause. However, the forfeiture clause was inapplicable because of the invalidity of the non-compete clause.
Furthermore, we find the forfeiture clause invalid because it goes beyond the permissible relief afforded by LSA-R.S. 23:921(G) which only allows the employer "to recover damages for the loss sustained and the profit of which he has been deprived." The forfeiture of "any of the amounts required to be paid under the provisions, terms and conditions" of the employment agreement because of a violation of the non-complete agreement goes far beyond that which is permissible under a strict construction of LSA-R.S. 23:921. See G.T. Michelli Company, Inc. v. McKey, 599 So.2d 355, 357 (La.App. 1 Cir.1992), which disallowed a liquidated damages clause in a non-compete agreement.
Even if we analyze the jury's finding on this issue pursuant to the manifest error standard of review,[18] we are convinced that Dr. Kimball was entitled to an award based on his accounts receivable claim. Section 7.05(a), supra, provides that the physician "shall ... receive" a percentage of the accounts receivable "[i]n the event this [employment] Agreement is terminated, for any reason whatsoever." (Emphasis added.) This provision is logical and just; Dr. Kimball actually earned a portion of the accounts receivable through his rendering of medical services. The undisputed testimony of the certified public accountant for ASBRI is that Dr. Kimball's share *416 of the accounts receivable is $225,333.77. Thus, a judgment in that amount, plus legal interest from date of judicial demand, is rendered in favor of Dr. Kimball.

REFORMATION OF THE TERMINATION CLAUSE IN THE EMPLOYMENT AGREEMENT
The employment agreement Dr. Kimball executed with ASBRI provided in Section 7.03 as follows:
The Corporation may terminate this Agreement with or with cause, at any time, upon furnishing the Physician with thirty (30) days written notice. (Emphasis added.)
The jury determined Section 7.03 of the employment agreement should be reformed to read "with or without cause." Dr. Kimball contends that the trial court erred by allowing the jury to reform the contract because the contract was not ambiguous. We disagree with Dr. Kimball's contention.
A simple reading of Section 7.03, supra, establishes that the clause "with or with cause" is grammatically illogical. Louisiana Civil Code article 2046 provides:
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.
We find that the clause "with or with cause" is not clear or explicit and any attempted application of such a clause could lead to absurd consequences. Thus, it was appropriate for the trial court to allow the jury to determine the parties' intent.
There was uncontradicted testimony by the attorney for ASBRI who prepared the employment agreement that the clause contained a typographical error and should have read "with or without cause." There was testimony that the intent was to write Section 7.03 so that ASBRI could terminate the employment agreement with or without cause. Dr. Kimball's testimony on this issue was inconsistent.
In sum, we believe the trial judge properly submitted this issue to the jury and the jury's finding was not manifestly erroneous.[19]Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Theriot v. Bourg, 96-0466, p. 14 (La.App. 1 Cir. 2/14/97), 691 So.2d 213, 223, writ denied, 97-1151 (6/30/97), 696 So.2d 1008.

STOCK REDEMPTION, VALUATION OF STOCK, AND SPECIFIC PERFORMANCE
Dr. Kimball complains about the award rendered by the jury regarding the value of his corporate stock in ASBRI.
The trial court determined in a ruling on a motion for summary judgment prior to the trial that Dr. Kimball continued to own 16.665 shares of stock in ASBRI after his termination. As a consequence, Dr. Kimball contends he was entitled to his share of any excess compensation[20] paid to the *417 remaining doctors/shareholders from the date of his termination through the trial. A linchpin determination regarding this issue was whether ASBRI attempted to purchase Dr. Kimball's stock pursuant to the stock buy/sell agreement[21] soon after his termination when a stock redemption agreement[22] was tendered to him.
The trial court ruled that the value of Dr. Kimball's ASBRI stock was to be determined by the jury according to the "book value" as established in the stock buy/sell agreement[23] and that the jury would determine whether ASBRI was entitled to specific performance requiring Dr. Kimball to transfer his stock to ASBRI. The jury determined that ASBRI was entitled to specific performance requiring Dr. Kimball to return his shares of stock to ASBRI.[24] Additionally, the jury determined that ASBRI was obligated to pay Dr. Kimball $34,724.56 for his 16.665 shares of ASBRI stock.
The evidence supports the jury's determination that ASBRI complied with the *418 terms of the stock buy/sell agreement when it offered to buy Dr. Kimball's stock. ASBRI prepared and presented to Dr. Kimball a document, the stock redemption agreement, which would resolve this matter by transferring his stock to ASBRI in exchange for an amount of money established by the stock buy/sell agreement. Dr. Kimball refused to execute the document transferring the stock.
David Sherman, corporate attorney for ASBRI, testified that he presented Dr. Kimball with a severance pay agreement, the stock redemption agreement, and a settlement and release agreement. Execution of the settlement and release agreement was not a condition of the stock transfer agreement. To corroborate the fact the settlement and release agreement was a separate document, evidence was introduced that established ASBRI was willing to resolve individual issues without requiring execution of the settlement and release agreement. On December 18, 1991, ASBRI paid Dr. Kimball $55,208.19 to resolve severance and vacation payments, compensation for work for others, car allowances, and malpractice payments. Dr. Kimball admitted receiving and cashing a check in that amount without signing a release.
Furthermore, there was testimony offered by the CPA for ASBRI that Dr. Kimball's stock was valued at $34,724.56 based on calculations pursuant to the stock buy/sell agreement.
We agree with the trial court's determination that the stock buy/sell agreement governed the valuation of the ASBRI stock and thus any evidence regarding the excess compensation was not relevant. Because the buy/sell agreement specified how to calculate the stock value, and because facts and figures regarding excess compensation are not part of this calculation, such evidence was properly excluded.[25]
In sum, there is sufficient evidence to establish that an unconditional offer was made to Dr. Kimball to purchase his stock in ASBRI pursuant to the stock buy/sell agreement after his termination. As such, the jury's determination that ASBRI was entitled to specific performance consisting of a transfer of Dr. Kimball's ASBRI stock *419 for the price of $34,724.56 was not manifestly erroneous.

DIRECTED VERDICT

RE: BREACH OF FIDUCIARY DUTY AND UNFAIR TRADE PRACTICES CLAIM
In the previous appeal before this court, we found that there remained genuine issues of material fact as to whether the other doctors/shareholders engaged in a scheme to conceal their intent to terminate Dr. Kimball until after the execution of agreements that would benefit them. Consequently, we reversed the trial court's granting of partial summary judgment in favor of defendants with respect to the unfair trade practices claim asserted by Dr. Kimball.[26] Also finding that there remained genuine issues of material fact as to whether the defendants breached a fiduciary duty to Dr. Kimball as a shareholder of ASBRI, we also reversed the trial court's grant of partial summary judgment in favor of the defendants on this claim.[27]See, Kimball v. Anesthesia Specialists of Baton Rouge, Inc., 98-2789 (La.App. 1 Cir. 6/23/00) (unpublished opinion).
At the trial of this matter, the trial court, in conformity with its prior ruling in favor of the individual doctors/shareholders on the breach of fiduciary duty claim, granted a directed verdict in their favor. Our prior reversal of the trial court's ruling on the motion for summary judgment requires that we reverse the grant of the directed verdict in favor of the individual doctors/shareholders, but only insofar as it relates to the unfair trade practices claim and the alleged breach of a fiduciary duty.[28]
In briefing this issue, Dr. Kimball inappropriately consolidates the proof of damages and the cause of action relative to breach of a fiduciary duty, contending the trial court erred by dismissing the individual defendants (doctors/shareholders) from the excess compensation claim[29] upon defendants' motion for directed verdict.
Although the alleged breach of a fiduciary duty to Dr. Kimball as a shareholder remains a viable cause of action based on our prior ruling, the measure of damages may or may not be related to any claim of excess compensation. Dr. Kimball still must prove that there was a breach of the fiduciary duty and also the damage sustained, if any.
Thus, the directed verdict in favor of the individual doctors/shareholders is reversed insofar as it relates to the cause of action for the alleged breach of a fiduciary duty to Dr. Kimball as a shareholder of the corporation.

DAMAGES FOR DOUBLE BOOKING
ASBRI filed a reconventional demand against Dr. Kimball requesting in part damages for "double bookings."[30] The jury responded to an interrogatory finding Dr. Kimball breached the employment *420 agreement and caused ASBRI damages of $16,923.82, the amount ASBRI claimed it was damaged due to double bookings.
Review of the employment contract makes it clear that double booking was not allowed. Section 2.01 of the employment contract provided as follows:
During the term of this Agreement, Physician shall render all of his medical and other professional services exclusively on behalf of the Corporation and agrees to practice medicine solely as an employee of the Corporation. Physician shall devote all of his professional time, attention and skill to the performance of his duties as an employee of the Corporation.
The testimony at trial established that Dr. Kimball engaged in the practice of double booking. He admitted to double booking his personal cases on ASBRI time. Multiple witnesses confirmed that he always scheduled his private pay cases between his ASBRI cases. Although other ASBRI doctors performed work outside of their work for ASBRI, there was no indication they did so while simultaneously performing services on behalf of the corporation. Testimony at the trial further established that Dr. Kimball's practice of scheduling private patients between ASBRI patients caused personnel shortages at Woman's Hospital and caused ASBRI to pay overtime to employees who were required to assist Dr. Kimball with his private patients.
There was sufficient evidence presented to the jury to indicate that Dr. Kimball was involved in double booking. The jury was not manifestly erroneous in finding that Dr. Kimball caused damages to the corporation for double booking. The jury's award to ASBRI in the sum of $16,923.82 is affirmed.

DIRECTED VERDICT ON ASBRI'S COUNTERCLAIMS
ASBRI appealed the trial court's grant of a motion for directed verdict by Dr. Kimball against ASBRI in its breach of fiduciary duty, intentional interference with contractual relations, deceptive trade practices and detrimental reliance counterclaims. All of these claims relate to the fact that Dr. Kimball returned to work at Woman's Hospital after his termination despite the non-compete agreement. However, because the trial court's decision finding the non-compete agreement to be unenforceable is affirmed, Dr. Kimball was not bound by the non-compete agreement. Consequently, because these counterclaims were contingent on Dr. Kimball being bound by the non-compete agreement, the trial court was correct in granting a directed verdict. As such, we affirm the grant of the directed verdict.

CONCLUSION
The judgment of the trial court signed on March 6, 2000, is reversed in part, affirmed in part, and rendered. The motion for directed verdict in favor of defendants, Dr. Fahimeh H. Tahvildari, Dr. Mark M. Walker, Dr. Ali Zarbalian, and Dr. Mary E. Corry, and against plaintiff dismissing the claims and causes of action of Dr. Baylen Kimball against the individual defendants is reversed, but only insofar as it relates to the unfair trade practices claim and the breach of a fiduciary duty to Dr. Kimball as a shareholder of ASBRI as determined in our previous opinion.[31] The portion of the judgment dismissing the claims and causes of action of Dr. Baylen *421 Kimball against Anesthesia Specialists of Baton Rouge, Inc. is reversed and judgment is rendered in favor of Dr. Baylen Kimball and against Anesthesia Specialists of Baton Rouge, Inc. in the amount of $225,333.77 with interest from date of judicial demand, representing Dr. Kimball's share of the accounts receivable. All other aspects of the judgment are affirmed.
The judgment of the trial court signed on March 17, 2000, granting a directed verdict in favor of Dr. Baylen Kimball and against defendants, Anesthesia Specialists of Baton Rouge, Inc., Fahimeh H. Tahvildari, M.D., Mark M. Walker, M.D., Ali Zarbalian, M.D., and Mary E. Corry, M.D. and dismissing all claims and causes of action against Dr. Kimball except those set forth or included in the judgment rendered by the court on March 6, 2000, is affirmed. The parties are responsible for their own costs on appeal.
REVERSED IN PART, AFFIRMED IN PART AND RENDERED.
NOTES
[1] It is noted that a non-compete agreement was included in the original agreement to purchase and sell stock and in the new employment contract. The new contracts included the non-compete agreement in the employment contract.
[2] Dr. Kimball filed suit to recover sums he alleged were due to him for his portion of the accounts receivable, as well as the amount due to him as a stockholder with a 1/6 interest in the corporation (his 1/6 interest consisted of 16.665 shares of stock). In addition, he sought damages for loss of income and loss of future value of the ASBRI stock. He sought to have the non-competition and forfeiture clauses of the employment contract, as well as the employment contract itself, declared null and void. He requested damages for defamation, use of unfair trade practices, and breach of a fiduciary duty. Dr. Kimball filed a supplemental and amended petition in which he listed lost profits and loss of fair value as a result of the sale of his residence as additional elements of damage. He prayed for general damages as a result of mental suffering, embarrassment, and defamation. Additionally, he sought attorney fees and interest on all sums from the date of filing until paid.
[3] Defendants filed a second supplemental and amended answer and reconventional demand in which they prayed for specific performance of obligations under the stock buy/sell agreement; damages suffered as a result of a breach of the stock buy/sell agreement; damages for breach of a fiduciary duty, unfair trade practices and intentional interference with contractual relations; and damages resulting from detrimental reliance by the defendants.
[4] This is the second time this case appears before this court. The case was previously appealed following a ruling on motions for summary judgment filed by the plaintiff and defendants. In an unpublished opinion rendered June 23, 2000, a five-judge panel of this court determined that a judgment granting partial summary judgment in favor of defendants on the issues of unfair trade practices and breach of fiduciary duty was in error. The case was remanded to the trial court on those issues. Kimball v. Anesthesia Specialists of Baton Rouge, Inc., 98-2789 (La.App. 1 Cir. 6/23/00) (unpublished opinion).

This case represents the problems that can result when a final judgment is rendered on some issues by the trial court and an appeal is taken while other issues are still pending before the trial court, as well as the mischief which LSA-C.C.P. art.1915 can create for the judiciary, the attorneys and the litigants. Although well intended from the standpoint of potentially resolving and eliminating some issues before the lower court, significant problems can result when the parties literally find themselves simultaneously coming and going between the trial court and the court of appeal while engaging in piecemeal litigation.
[5] The March 6, 2000 judgment granted a directed verdict in favor of the other individual doctors/shareholders, dismissing all of Dr. Kimball's claims and causes of action against them.
[6] Because these assignments of error are related to various topics, we will address related issues when addressing the relevant topics and thus address each assignment of error, although not individually. The assignments of error will not be delineated in any detail except as addressed in the course of the balance of this opinion.
[7] Also referred to as a non-compete clause or agreement.
[8] For a detailed discussion of LSA-R.S. 23:921, see Jeffery D. Morgan, Comment, If At First You Don't Succeed: Louisiana's Latest Statutory Enactment Governing Agreements Not to Compete, 66 Tul.L. Rev. 551 (1991), cited in Louisiana Smoked Products, Inc. v. Savoie's Sausage & Food Products, 96-1716, 96-1727, pp. 5-7 (La.7/1/97), 696 So.2d 1373, 1376-1377, and SWAT 24 Shreveport Bossier, Inc. v. Bond, 00-1695, p. 16 n. 9 (La.6/29/01), 808 So.2d at304-305, n. 9.

The employment agreement was signed in 1991, so we must apply the version of the statute then in effect. See Walker v. Louisiana Health Management Company, 94-1396, p. 17 (La.App. 1 Cir. 12/15/95), 666 So.2d 415, 426, writ denied, 96-0571 (4/19/96), 671 So.2d 922.
[9] Another reason cited for the prohibition against non-compete agreements was stated as follows: "The basic premise underlying the prohibition stems from the fundamental right of individuals to seek success in our free-enterprise society." Cellular One, Inc. v. Boyd, 94-1783, 94-1784, p. 1 (La.App. 1 Cir. 3/3/95), 653 So.2d 30, 36 (Shortess, J., dissenting), writ denied, 95-1367 (9/15/95), 660 So.2d 449.
[10] Citing Hirsh v. Miller, 249 La. 489, 187 So.2d 709, 714 (1966); Turner Professional Services, Ltd. v. Broussard, 99-2838, p. 3 (La. App. 1 Cir. 5/12/00), 762 So.2d 184, 185, writ denied, XXXX-XXXX (9-29-00), 770 So.2d 356.
[11] SWAT 24, 00-1695 at 18, 808 So.2d at 304.
[12] Petroleum Helicopters, Inc. cited Dixie Parking Service, Inc. v. Hargrove, 96-1929 (La. App. 4 Cir. 3/26/97), 691 So.2d 1316, indicating that the fourth circuit in Dixie upheld a non-competition agreement that did not specifically name the parishes included in the geographic limitation. However, the agreement in Dixie specifically listed in an attached schedule the parishes where the employer conducted business. "The fact that the exhibit setting forth those parishes in which Dixie was operating lists additional parishes is not fatal to its enforcement in Orleans and Jefferson parishes." Dixie, 96-1929 at 9, 691 So.2d at 1320. Additionally, we note Dixie cited Water Processing Technologies, Inc., supra, which clearly held that a failure to specify the applicable parishes to which the non-compete agreement applied rendered the agreement unenforceable.
[13] See SWAT 24 Shreveport Bossier, Inc. v. Bond, 33,328, pp. 5-8 (La.App. 2 Cir. 5/10/00), 759 So.2d 1047, 1050-1051, which discusses the "widely divergent" application and interpretation of LSA-R.S. 23:921 by the various circuits.
[14] See Water Processing Technologies, Inc., supra, which declined to reform the non-competition clause in favor of the employer.
[15] LSA-R.S. 23:921(D) now addresses partner/partnership relations.
[16] Although not briefed by the parties, in an effort to be thorough; we note a potential issue relative to the enforceability of a non-compete agreement against one engaged in a profession. See Morgan, J., Comment, 66 Tul.L.Rev. at 565-568, which notes the divergent treatment of this issue in other states. We need not address this issue because our decision renders it moot.
[17] In the previous section, we affirmed the trial court's ruling that the non-compete clause was unenforceable and could not be reformed.
[18] See Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).
[19] This finding that the employment contract entitled ASBRI to terminate Dr. Kimball with or without cause renders moot the issues related to whether ASBRI had cause to terminate Dr. Kimball. However, if we were to consider this issue, we would conclude the jury was not manifestly erroneous in its determination that ASBRI had cause to terminate Dr. Kimball.
[20] An expert for Dr. Kimball testified in proffered testimony that the excess compensation was the difference between the average earnings of an anesthesiologist and the amount earned by the doctors/shareholders with ASBRI. Dr. Kimball's theory was that this excess compensation should be considered in calculating the value of his ASBRI stock, or alternatively, this excess compensation was in effect "dividends" which should have been divided among the ASBRI doctors/shareholders, including him. Because of his continuing stock ownership, he contended he was entitled to his proportionate share of these "dividends" an amount of $1,952,000.
[21] As previously indicated, at the time Dr. Kimball and ASBRI executed the employment agreement, ASBRI and the doctors/shareholders also executed a stock buy/sell agreement.
[22] One must distinguish the stock buy/sell agreement from the stock redemption agreement. The stock redemption agreement was prepared following Dr. Kimball's termination so as to effectuate the actual transfer of Dr. Kimball's ASBRI stock pursuant to the terms and conditions of the stock buy/sell agreement.
[23] Section 2.3 of the stock buy/sell agreement reads, in pertinent part:

Within the aforementioned sixty (60) day period the Corporation shall cause to be prepared and executed the documents necessary to effectuate the transfer. The purchase price to be paid by the Corporation to the transferring Shareholder shall be the transferring Shareholder's pro rata portion of the "book value" of the Corporation determined as of the last day of the calendar month preceding the calendar month in which the aforementioned written notice was received by the Corporation or the relevant death, disability or termination of employment occurs. "Book value" shall be computed by the certified public accountant regularly employed by the Corporation utilizing the accrual basis method of accounting excluding any and all accounts receivable.
[24] Plaintiff hurls a cornucopia of legal theories at this factual determination by the jury in an attempt to convert this factual determination into a legal issue on appeal. We summarily reject all of these legal theories. The trial court did not err regarding the failure to give a "clean hands" instruction regarding specific performance because the stock buy/sell agreement entered into by the parties specifically provided for a methodology for transfer of the stock (i.e., specific performance) upon termination from employment. Res judicada does not apply because the trial court's ruling regarding ownership of the stock was an interlocutory ruling, not a final judgment. See LSA-R.S. 13:4231. Furthermore, the trial court's earlier ruling regarding ownership of the stock is a wholly separate and distinct issue from whether the corporation was entitled to specific performance requiring Dr. Kimball's transfer of the ASBRI stock. The trial court ruled that a purchase of the stock had not taken place. Thus, Dr. Kimball was still the owner of the stock. However, the trial court had not ruled on the issue of whether ASBRI was entitled to specific performance. This represents two separate issues: 1) whether the stock had been purchased, as opposed to 2) whether ASBRI was entitled to specific performance. Earlier in the litigation, the court resolved the first issue and determined the transfer of the stock was not self-operating and Dr. Kimball still owned the stock. The second issue was appropriately submitted to the jury because this issue involved factual determinations concerning whether ASBRI attempted to redeem Dr. Kimball's stock.
[25] The value of Dr. Kimball's stock in ASBRI was appropriately established based on the provisions of the stock buy/sell agreement. Upon his termination, or at anytime thereafter, Dr. Kimball could have demanded that he be compensated for his stock pursuant to the terms of the stock buy/sell agreement. He is not entitled to be compensated for the stock beyond the terms of that agreement merely because he retained ownership of the stock. Because the stock buy/sell agreement set forth a methodology for establishing the value of the stock, Dr. Kimball could not hold the stock for years as if a speculator, and then demand to be compensated for any alleged increase in value.

The stock buy/sell agreement provides for reciprocal obligationsthe corporation shall buy and Dr. Kimball shall sell his ASBRI stock. Article V of the stock buy/sell agreement provides in part: "In the event a Shareholder's employment with the Corporation is terminated for any reason, other than death or disability, the Shareholder shall be obligated to sell his or her stock to the Corporation and the Corporation shall be obligated to purchase such stock." The stock buy/sell agreement requires ASBRI to prepare the documentation necessary to effectuate the stock transfer, but is silent as to what is to occur if either party subsequently fails to comply with the obligation to sell or purchase. There is factual support for a finding that although a stock redemption agreement was prepared and submitted to Dr. Kimball, he never tendered his shares of stock and refused to sign the agreement. Without the stock being tendered or the stock redemption agreement being executed, there is no obligation to pay for the stock. Based on the facts of this case, we cannot say the trial court erred in submitting to the jury for determination the issue of whether ASBRI was entitled to specific performance.
[26] See Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1405 et seq.
[27] See LSA-R.S. 12:91(A).
[28] In light of the pending appeal relative to the partial summary judgment that had been granted in favor of the other doctors/shareholders, the trial court no longer had jurisdiction with respect to these two claims at the time of the trial of this matter. See LSA-C.C.P. art 2088.
[29] For a description of the excess compensation claim, see footnote 17, supra.
[30] This is a practice of scheduling ASBRI anesthesia procedures and anesthesia services for which Dr. Kimball was personally compensated at or near the same time.
[31] See Kimball v. Anesthesia Specialists of Baton Rouge, Inc., 98-2789 (La.App. 1 Cir. 6/23/00) (unpublished opinion).