1 ¡¿PARRO, Judge.
This case involves an appeal by the Louisiana Department of Revenue and Taxation from a district court judgment affirming a judgment of the Louisiana Board of Tax Appeals in favor of the taxpayer based on a finding that no portion of a Texas punitive damage award was apportionable income for Louisiana corporate income tax and franchise tax purposes.

Factual Background and Procedural History

American National Petroleum Company (American) is an independent gas producer with its principal office located in Houston, Texas.[1] American owned a working interest in two gas wells in the Vermilion field in the Gulf of Mexico off the Louisiana coast and in five gas wells in the Oakvale field in Mississippi. As the only pipeline company servicing the Vermilion field, Transcontinental Gas Pipeline Corporation (Transco)[2] purchased the gas produced from this field from American pursuant to a take-or-pay gas contract. The contract obligated Transco to take or pay for specified annual and monthly percentages of American’s gas delivery capacity at certain prices.
American entered into operating agreements (gas balancing agreements) with working interest owners in the Vermilion field. Under the operating agreements, if a particular owner’s working interest was underproduced and another owner’s interest was overproduced, the underproduced owner could ask the designated field operator to bring it back into balance with the other working interest owners by reallocating an appropriate amount of the sales proceeds from gas taken by Transco. The designated field operator received a monthly notice of how much gas Transco *375 intended to buy, upon receipt of which it instructed Transco on how to allocate the payment to the various working interest owners in accordance with their fractional interests and with due regard for the un-derbalance/overbalance situation.
laWhen gas prices dropped in the 1980s, Transco tried to reduce the prices it was paying to American and other gas producers by buying more gas from those producers who did accept such a reduction and taking less from those who did not. The strong-arm tactics used by Transco to force American to accept the reduced prices were in direct conflict with their take-or-pay gas contract. American’s acceptance of reduced rates affected its ability to fulfill its obligations under its gas balancing contracts related to the same gas wells. As a result of Transco’s actions, American filed suit in Texas against Tran-sco for breach of their take-or-pay gas contract, breach of the duty of good faith, and tortious interference with the gas balancing contracts American had with certain Louisiana gas producers. American was successful in its suit against Transco. Transcontinental Gas Pipe Line Corporation v. American National Petroleum Company, 763 S.W.2d 809 (Tex.App.-— Texarkana 1988), rev’d in part, 798 S.W.2d 274 (Tex.1990). The Texas jury determined that Transco had breached its take- or-pay gas contract with American and had interfered with the gas balancing agreements between American and their co-interest owners in the Vermilion field and the Oakvale field. Such interference was found to be without justification and with malice. Based on these findings, Transco was ordered to pay American the following damage awards: $1,582,258 in actual damages for breach of contract, $16,000,000 in exemplary/punitive damages for tortious interference with a contract, $1,000,000 in attorney fees, and $2,417,742 in interest. Of the damage award for breach of contract, 44.3092 percent was attributable to Louisiana with the remainder being attributable to Mississippi.
The Louisiana Department of Revenue and Taxation (Department) audited American’s Louisiana income tax returns for 1990, 1991, and 1992 and its franchise tax returns for 1991, 1992, and 1993. In light of the monetary awards received by American in its suit against Transco, the Department issued an income tax assessment to American seeking additional corporate income taxes for 1991 of $46,272.16, plus interest of $42,067.64. In a separate franchise tax assessment, the Department sought additional corporate franchise tax totaling $44,403 ($11,322 for 1991, $15,924 for IJL992, and $17,157 for 1993), plus interest of $39,501.61. American filed protests with the Department, which were denied. Subsequently, American appealed the Department’s action by filing a petition with the Louisiana Board of Tax Appeals (Board) for a redetermination of the assessments. See LSA-R.S. 47:1431.
Although the parties agreed that the punitive damage award for tortious interference with a contract constituted appor-tionable income, they disagreed as to how such damage amount should be apportioned among Louisiana, Mississippi, and Texas. The Department’s assessment was based on an apportionment of 44.3092 percent of the punitive damage award to Louisiana for purposes of imposing 1991 income taxes and 1992 franchise taxes.[3] American argued that no part of the punitive damage award was attributable to *376 Louisiana and that 100 percent of such award was attributable to Texas.
In written reasons for judgment, the Board stated:
In the Texas case that gave rise to the punitive damages there were two contracts under consideration. One was a gas purchase contract between [Tran-sco] and [American] and the other was the gas balancing contract between [American] and the other fractional owners of the Vermilion field. The award of punitive damages was based on the tor-tious interference by [Transco] with the gas balancing contract.... The tortious interference is a tort. The actual damages was a breach of contract. The exemplary damages were paid as a result of the tort cause of action. [Tran-sco] coerced [American] into a favorable settlement with [Transco] pertaining to their contract by threats to [American’s] contract with third parties — the gas balancing contract.
In the decision of the Texas supreme court 798 S.W.2d 274 at page 279, it was stated: “The evidence construed favorably to support the jury verdict was that [Transco] threatened the gas operators (and through them the other interest owners) that if those third parties insisted on performance of their gas balancing agreement with [American], then [Tran-sco] would breach its own contracts with those third parties to their economic detriment.” It appears clear that the conduct that gave rise to the $16,000,000 exemplary damage award was rooted in Louisiana. It was the tortious interference by [Transco] in contracts between [American] as an owner of minerals, an immovable, located in Louisiana and other owners of minerals in Louisiana that gave rise to the punitive damages.
The fact that weighs in favor of the position of the [Department] is that the tortious interference of contract pertained to the gas balancing contracts that were between gas owners or lessees in the state of | BLouisiana. The facts in favor of the position of [American] are: (1) the parties to the suit that gave rise to the damages had their principal offices in the state of Texas; (2) it appears that the decision to interfere with the gas balancing agreement took place in Texas; (3) the [lawsuit] giving rise to the damages was tried in Texas; and (4) the cause of action that gave rise to the punitive damages was a creature of Texas and not Louisiana law. It is the opinion of the Board that, considering all of the merits of the case, that the cause of action that gave rise to the punitive damages was much more rooted in Texas than in Louisiana.
Although the Board recognized that the tortious interference of contract pertained to the gas balancing contracts that were between gas owners or lessees in Louisiana, it found that the cause of action that gave rise to the punitive damages was much more rooted in Texas than in Louisiana. Based on this finding, the Board vacated the income tax assessment and reduced the franchise tax assessment for the franchise tax year 1992 by $12,615, plus applicable interest.[4] From that portion of the Board’s judgment, the Department sought judicial review by the appropriate district court. See LSA-Const. art. V, § 16(B); LSA-R.S. 47:1434 and 1435.
LSA-R.S. 47:287.95, relative to income tax, and LSA-R.S. 47:606, relative to franchise tax, address how to calculate the *377 Louisiana portion of certain types of income. The district court recognized that these statutes, however, did not specifically do so with respect to the punitive damage award at issue in this case. Nonetheless, the district court acknowledged, that these statutes grant discretion to the Department in determining a reasonable method of sourcing “other classes of gross apportionable income” or “other revenues.” See LSA-R.S. 47:287.95(F)(5); LSA-R.S. 47:606(A)(l)(k). The Department submitted that its secretary’s sourcing of punitive damages in the manner in which actual damages were apportionable was a reasonable exercise of the discretion afforded under these statutes.
The district court accepted the facts as found by the Board and determined that the Board had correctly applied the law, which it found to be ambiguous relative to the imposition of a tax on punitive damages assessed outside of Louisiana. Construing the tax in favor of the taxpayer, the district court ruled that the punitive damages were Improperly attributable to Texas. From the district court judgment affirming the judgment of the Board, the Department suspensively appealed, claiming that the Department’s secretary’s exercise of discretion afforded by applicable statutes was reasonable.

Discussion

Judicial review by the district court of a decision or judgment of the Board shall be rendered upon the record as made up before the Board and is limited to facts on the record and questions of law. Louisiana Power & Light Company v. McNamara, 550 So.2d 1345, 1347 (La.App. 1st Cir.1989), writ denied, 559 So.2d 120 (La.1990), quoting St. Pierre’s-Fabrication and Welding, Inc. v. McNamara, 495 So.2d 1295, 1298 (La.1986); see LSA-R.S. 47:1434. The Board’s findings of fact should be accepted where there is substantial evidence in the record to support them and should not be set aside unless they are manifestly erroneous in view of the evidence in the entire record. Louisiana Power & Light Company v. McNamara, 550 So.2d at 1347. With regard to questions of law, the judgment of the Board should be affirmed if the Board has correctly applied the law and has adhered to the correct procedural standards. Louisiana Power & Light Company v. McNamara, 550 So.2d at 1347.
Equal and uniform taxes may be levied on net incomes, and these taxes may be graduated according to the amount of net income. LSA-Const. art. VII, § 4(A). The Louisiana Corporation Income Tax law, LSA-R.S. 47:287.2 et seq., imposes a tax on the Louisiana taxable income of corporations. LSA-R.S. 47:287.11. “Louisiana net income” means net income[5] which is earned within or derived from sources within the State of Louisiana. LSA-R.S. 47:287.67. Louisiana net income or loss of a corporation is determined by applying the allocation and apportionment provisions of the Louisiana Corporation Income Tax law to the corporation’s gross income, allowable deductions, and net income for a taxable year as determined and computed pursuant to such law. LSA-R.S. 47:287.77. Concerning the determination of Louisiana net income, LSA-R.S. 1747:287.91 states that the Louisiana net income of a corporation is the sum produced by combining the net allocable in *378 come or loss as provided in LSA-R.S. 47:287.93 and the net apportionable income or loss as provided in LSA-R.S. 47:287.94 when the result is more than zero. The classification of gross income as allocable or apportionable is addressed in LSA-R.S. 47:287.92, which in 1991 provided:[6]
A. All items of gross income, not otherwise exempt, shall be segregated into two general classes designated as allocable income and apportionable income.
B. Allocable income. The class of gross income to be designated as “allo-cable income” shall include only the following:
(1) Rents and royalties from immovable or corporeal movable property.
(2) Profits or losses from sales or exchanges of property, including such items as stocks, bonds, notes, land, machinery, and mineral rights not made in the regular course of business.
(3) Interest income.
(4) Dividends from corporate stock.
(5) Royalties or similar revenue from the use of patents, trademarks, copyrights, secret processes, and other similar intangible rights.
(6) Income from estates, trusts, and partnerships.
(7) Income from construction, repair, or other similar services.
C. Apportionable income. The class of income to be designated as “ap-portionable income” shall include all items of gross income which are not properly includable in allocable income as defined in this Section.
The parties agree that the punitive damages at issue in this case are properly classified as apportionable income, the computation of which is governed by LSA-R.S. 47:287.94, which in relevant part provides:
A. Total net apportionable income. Total net apportionable income or loss is computed by subtracting the following from gross apportionable income:
ls(l) All expenses, losses, and other deductions defined in R.S. 47:287.63 as allowable deductions which are directly attributable to gross apportionable income.
(2) A ratable portion of such allowable deductions which are not directly attributable to any item or class of gross income.
B. Apportionment to Louisiana. Net apportionable income or loss is computed by multiplying the total net appor-tionable income or loss by the Louisiana apportionment percent determined in accordance with the provisions of R.S. 47:287.95.
[[Image here]]
E. When the secretary finds that the use of the apportionment method by a taxpayer produces a manifestly unfair result and that the separate accounting method would more equitably determine the amount of net income derived from sources in Louisiana, the secretary may require that the separate accounting method be used in such case.
F. Whenever there is a dispute between the taxpayer and the secretary as to whether the separate accounting method or the apportionment method *379 should be used, the burden shall be upon the party urging the use of the separate accounting method to show that the apportionment method produces a manifestly unfair result.
In this case, the position urged by the Department is based on the use of the apportionment method set forth in LSA-R.S. 47:287.94 and does not involve the use of a separate accounting method.
LSA-R.S. 47:287.95 expressly provides for the determination of the Louisiana apportionment percent relative to air transportation, pipeline transportation, other transportation, service enterprises, loan business, manufacturing, merchandising, and other business. Admittedly, the income in question is not derived from any of these enumerated businesses. Thus, the Department focuses on the last sentence of subsection F(5) of section 287.95[7] as the applicable provision for the determination of the Louisiana apportionment percent relative to the punitive damage award, which provides:
All other classes of gross apportionable income shall be prorated within or without this state on the basis of such ratio or ratios, prescribed by the secretary, as may be reasonably applicable to the type of business involved.
laAmerican does not dispute this position.
The Louisiana Corporation Franchise Tax law, LSA-R.S. 47:601 et seq., is imposed annually on a corporation, domestic or foreign, as an excise for the privilege of carrying on or doing business in Louisiana, the exercising of its charter or the continuance of its charter within Louisiana, or the owning or using any part or all of its capital, plant, or other property in Louisiana. LSA-R.S. 47:601(A). As with the income tax, Louisiana uses ratios or factors to determine what portion of a corporation’s tax base is attributable to Louisiana. The factors to be used depend on the nature of the taxpayer’s business, but will generally include the value of the taxpayer’s property and the net sales and other revenue. See LSA-R.S. 47:606(A). The factor at issue in this case relative to the punitive damages award is the net sales and other revenue factor. This factor is based on the ratio that the net sales made to customers in the regular course of business and other revenue attributable to Louisiana bears to the total net sales made to customers in the regular course of business and other revenue. LSA-R.S. 47:606(A)(1). Subsection A(l) further provides:
For the purposes of this Sub-section net sales and other revenues attributable to Louisiana shall be determined as follows:
(a) Sales attributable to this state shall be all sales where the goods, merchandise or property is received in this state by the purchaser. In the case of delivery of goods by common carrier or by other means of transportation, including transportation by the purchaser, the place at which the goods are ultimately received after all transportation has been completed shall be considered as the place at which the goods are received by the purchaser. However, direct delivery into this state by the taxpayer to a person or firm designated by a purchaser from within or without the state shall constitute delivery to the purchaser in this state. Revenue de *380 rived from a sale of property not made in the regular course of business shall not be considered.
(b) Revenues attributable to this state derived from air transportation shall include all gross receipts derived from passenger journeys and cargo shipments originating in Louisiana.
(c) Revenues attributable to this state derived from transportation of crude petroleum, natural gas, petroleum products or other commodities for others through pipelines shall include all gross revenue derived from operations entirely within this state plus a portion of any revenue from operations partly within and partly without this state, based upon the ratio of the number of units of transportation service performed in Louisiana in connection with such revenue to the total of such units. A unit of | mtransportation service shall be the transporting of any designated quantity of crude petroleum, natural gas, petroleum products or other commodities for any designated distance.
(d) Revenues attributable to this state derived from transportation other than aircraft or pipeline shall include all such income that is derived entirely from sources within this state, and a portion of revenue from transportation partly without and partly within this state, to be prorated subject to rules, and regulations of the collector, which shall give due consideration to the proportion of service performed in Louisiana.
(e) Revenues from services other than those described above shall be attributed within and without Louisiana on the basis of the location at which the services are rendered.
(f) Rents and royalties from immovable or corporeal movable property, shall be attributed to the state where such property is located at the time the revenue is derived.
(g) Interest on customers’ notes and accounts shall be attributed to the state in which such customers are located.
(h) Other interest and dividends shall be attributed to the state in which the securities or credits producing such revenue have their situs, which shall be at the business situs of such securities or credits, if they have been so used in connection with the taxpayer’s business as to acquire a business situs, or, in the absence of such a business situs shall be at the commercial domicile of the corporation.
(i) Royalties or similar revenue from the use of patents, trade marks, copyrights, secret processes and other similar intangible rights shall be attributed to the state or states in which such rights are used.
(j) Revenues from a parent or subsidiary corporation shall be allocated as provided in Sub-section B of this Section.
(k) All other revenues shall be attributed within and without this state on the basis of such ratio or ratios, prescribed by the collector, as may be reasonably applicable to the type of revenues and business involved.
LSA-R.S. 47:606(A)(1). Because the legislature did not specifically provide for the attribution of a punitive damage award pursuant to a suit for tortious interference with a contract involving Louisiana gas wells, the parties agree that the legislature intended that determination of such would be governed by the catchall provision found in subsection A(l)(k).
This court finds the pertinent language contained in LSA-R.S. 47:287.95(F)(5) regarding the determination of the Louisiana apportionment percentage for income tax purposes and LSA-R.S. *381 47:606(A)(l)(k) regarding an allocation formula for franchise tax Inpurposes, to be essentially the same relative to the issue presented in this case. In this respect, the Department maintains that the legislature has explicitly granted discretion to its secretary to determine a reasonable method for sourcing a punitive damage award. It submits that these provisions require that the secretary’s discretion simply be reviewed for reasonableness. Under such a review, the Department urges that the secretary’s exercise of discretion in this case should be upheld because of his reliance on the apportionment based on the actual damages award. In analyzing this assertion, we must review the nature of the awards made in favor of American in the underlying breach of contract/tort action.
Damages awarded in lawsuits are either ordinary (compensatory) or exemplary (punitive). See Billiot v. B.P. Oil Company, 93-1118 (La.9/29/94), 645 So.2d 604, 612.[8] In a suit on a contract, ordinary damages are intended to put the plaintiff in the same economic position it would have been in had the contract been fulfilled as planned. Thus, the objective of an ordinary (compensatory) damage award is to repair the damage caused by the party that breached the contract. See Bienvenu v. Dudley, 95-0547 (La.App. 1st Cir. 10/3/96), 682 So.2d 281, 284, writs denied, 96-2661, 96-2673 (La.12/13/96), 692 So.2d 1069, 1070. On the other hand, punitive damages are given to the plaintiff over and above the full compensation for the ordinary damages, for the purposes of punishing the tortfeasor defendant, teaching the defendant not to do it again, and deterring others from following the defendant’s example. Billiot v. B.P. Oil Company, 645 So.2d at 612; see Bienvenu v. Dudley, 682 So.2d at 284. Punitive damages thus have more to do with the tortfeasor than with the victim. Billiot v. B.P. Oil Company, 645 So.2d at 612. Another justification for a punitive or exemplary damage award is that it provides an incentive to the plaintiff to sue in cases where the public interest requires some action against the defendant, but, in the absence of a h ¡..punitive award, the plaintiff might be insufficiently encouraged to bring a civil action or press criminal charges. The punitive award under this theory is viewed as a bounty, or as an incentive to the plaintiff to act as a kind of “private attorney general.” Billiot v. B.P. Oil Company, 645 So.2d at 612.
Actual damages were awarded to American for Transco’s breach of the take-or-pay gas contract. The take-or-pay gas contract obligated Transco to buy specified annual and monthly percentages of American’s gas delivery capacity at certain prices. When gas prices dropped in the 1980s, Transco tried to reduce the prices it was paying to American and other gas producers. The evidence supported a finding that Transco knew its actions were a breach of its take-or-pay gas contract with American and knew it would cause American, as a gas operator, to breach the gas balancing agreements with other interest owners. Furthermore, the evidence supported a finding that Transco purposefully engaged in that course of action to *382 put economic pressure on American to settle the outstanding liability claims it had against Transco. American National Petroleum Company v. Transcontinental Gas Pipe Line Corporation, 798 S.W.2d 274, 279 (Tex.1990).
The actual damages award was arrived at by determining the amount of money that would have been transferred from Transco to American for gas sales absent a breach of the take-or-pay gas contract by Transco. See American National Petroleum Company v. Transcontinental Gas Pipe Line Corporation, 798 S.W.2d at 278. These compensatory damages relate directly to revenues that would have been earned within or derived from sources within the State of Louisiana as required by LSA-R.S. 47:287.67 and 606(A)(1). Thus, the attribution of this income based on the location of the gas fields covered by the take-or-pay gas contract was proper and did not offend constitutional limitations on state interference with such commerce. See Northwestern States Portland Cement Company v. Minnesota, 358 U.S. 450, 79 S.Ct. 357, 362, 3 L.Ed.2d 421 (1959);[9] Kansas City Southern Railway Company v. Reily, 242 La. 235, 135 So.2d 915, 916 (1961), appeal dismissed, 370 U.S. 289, 82 S.Ct. 1561, 8 L.Ed.2d 501 (1962).[10]
Does the location of some of the gas wells in Louisiana also support a finding that a portion of the punitive damage award is attributable to this state? The Department suggests that it does and asserts the existence of a direct relationship between actual damages and punitive damages. It submits that, under Texas law, punitive damages could not have been awarded absent an award of actual damages or equitable relief, citing Seelbach v. *383 Clubb, 7 S.W.3d 749, 762 (Tex.App.—Texarkana 1999). Based on Texas law to that effect, the Department argues that the percentage of actual damages attributable to Louisiana would support the attribution of punitive damages in the same proportions, in that the punitive damages are integrally tied to the gas well contracts.
This argument overlooks the fact that the actual damages award on which the Department relies was made in light of Transco’s breach of its take-or-pay gas contract with American. The punitive damage award, on the other hand, was made in | ^conjunction with Transco’s tor-tious interference with the gas balancing agreements existing between American and other third parties. Thus, the recovery of actual damages was in contract, and the recovery of punitive damages was in tort.
Absent an award of actual damages for Transco’s tortious interference with American’s gas balancing agreements, Transco (relying on the above referenced law) challenged the jury’s award of punitive damages for such action. The Texas court of appeals reversed the award of punitive damages based on a finding that such an award was precluded in light of American’s failure to obtain a separate finding of tort damages. Transcontinental Gas Pipe Line Corporation v. American National Petroleum Company, 763 S.W.2d at 822. In reviewing this case, the Texas Supreme Court noted that the jury awarded $16,000,000 as punitive/exemplary damages for Transco’s tortious interference with American’s gas balancing agreements, but made no separate finding of actual damages for the tortious interference. American National Petroleum Company v. Transcontinental Gas Pipe Line Corporation, 798 S.W.2d at 278. The Texas Supreme Court observed:
Had Transco ... not interfered with the gas balancing agreements, the amount Transco would have paid [American] would not necessarily have been the amount Transco should have paid [American] under its direct contracts with those parties. Transco was paying [American] a price rate based on the market price for “spot” gas, and the jury apparently found that to be an improper price under the contract. The gas balancing agreement with the operators and among the interest owners only dealt with how the relative amounts of gas actually taken would be allocated to the interest owners, not the price the pipeline company was paying that interest owner for the gas.
Thus in at least this one respect, the damages for the contract interfered with (the gas balancing agreement) could and apparently did differ from the total damages for Transco’s breach of contract. The jury and trial court determined that Transco was paying at a rate too low under its contracts with [American]. The responsibilities of the co-interest owners under the gas balancing agreement would not have included the underpayment amount, which was strictly a matter between Transco and [American]. The tortious interference with contract actual damages would have differed by at least that amount.
American National Petroleum Company v. Transcontinental Gas Pipe Line Corporation, 798 S.W.2d at 278-279. Based on these findings and the evidence of record, the court concluded that the jury could have found actual damages as a result of American’s |1fibreach of the gas balancing agreements, which would have been an element of actual damages for its tortious interference claim against Transco. Accordingly, it remanded the case to the court of appeals for consideration of an award of actual tort damages.
*384 On remand, the court of appeals noted that American was underproduced and Transco refused the request from the operators under the gas balancing agreements to get them into balance. Transco’s refusal to allow compliance with these agreements was for the purpose of putting economic pressure on American, as well as others, to force it to yield to Transco’s terms for amending the take-or-pay gas contract. By such pressure, Transco tor-tiously interfered with the gas balancing agreements causing damage to American as a result of being underbalanced.[11] Although it found that American had suffered actual damages as a result of Tran-sco’s tortious conduct, it concluded that the extent of such damages had not been established at trial. American National Petroleum Company v. Transcontinental Gas Pipe Line Corporation, 9602, p. 1 (Tex.App.—Texarkana) (unpublished), vacated, 806 S.W.2d 301 (Tex.App.—Texarkana 1991). Having found that American had in fact suffered actual damages, in an unspecified amount, as a result of Tran-sco’s tortious conduct, the appellate court upheld the jury’s award of punitive damages and relied on Transco’s stipulation that tort damages, if found, would be the same as the damages recoverable for breach of its take-or-pay contract in finding that punitive damages were reasonably proportioned to actual damages as required by Texas law.[12] American National Petroleum Company v. 11fiTranscontinental Gas Pipe Line Corporation, 9602 at 3. Accordingly, no separate award for actual tort damages was made by the court.
Although Texas law seemingly requires a finding of actual damages as a result of the tortious interference with a contract as a prerequisite to the giving of an award of punitive damages on account of that conduct, we conclude that the upholding of the punitive damage award in the Texas suit does not support a finding that the income resulting from such an award was earned within or derived from sources within the State of Louisiana as required by LSA-R.S. 47:287.67 and 606(A)(1). In Louisiana, punitive damages are not allowed except for some particular wrong for which a statute expressly authorizes the imposition of such a penalty. Killebrew v. Abbott Laboratories, 359 *385 So .2d 1275, 1278 (La.1978); e.g. LSA-C.C. arts. 2315.4. Louisiana’s historical rejection of the common law remedy of punitive or exemplary damages was based on the perception that an award of exemplary damages serves as a windfall to the plaintiff. The quantum of punitive damages is not related to the injury suffered by the plaintiff, but to the quality of the defendant’s wrongful act. Sharp v. Daigre, 564 So.2d 303 (La.1990) (Dennis, J., dissenting).
Louisiana law does not authorize the recovery of punitive damages for tor-tious interference with a contract. But for Texas law authorizing the recovery of punitive damages, American would not have been entitled to such an award in Louisiana. By its legislature’s enactment of such a statute, the State of Texas sought (1) to penalize and punish defendants, such as Transco, for tortiously interfering with a contract; (2) to deter Transco and others who might follow their example; and (3) to provide victims injured by such conduct (like American) with the incentive to act as the prosecutors of penal laws against such wrongdoers. Transco and American had their principal offices in Houston, Texas. It is undisputed that the wrongful conduct giving rise to the punitive damage award occurred in Texas where the business of Transco and American was conducted.
Under the allocation method suggested by the Department’s secretary, the punitive damages award would be attributed in the same proportion as the actual 117damages award; thus, no portion of the punitive damage award would be attributable to the state (Texas) that imposed a fine or penalty to protect the public’s interest.[13] Under the facts presented in this case, we find no error in the district court’s affirmance of the Board’s implicit finding that the method utilized by the Department’s secretary was not reasonably applicable to the type of revenue involved.[14]

Decree

For the foregoing reasons, the judgment of the district court is affirmed. Costs of this appeal in the amount of $1,151.02 are assessed to the Louisiana Department of Revenue and Taxation.
AFFIRMED.
GUIDRY, J., concurs.
FITZSIMMONS, J., concurs, and assigns reasons.

. American is a Delaware corporation that was authorized to do business in Louisiana.

. Transco's principal office was also located in Houston, Texas.

. The Department’s determination of the apportionment percentage was based on the apportionment of actual damages for breach of the take-or-pay gas contract between American and Transco.

. Additionally, the Board determined that the awards for interest income and attorney fees were attributable solely to Texas.

. Net income of a corporation for a taxable year means the taxable income of the corporation computed in accordance with federal law for the same accounting period and under the same method of accounting, including statutorily required accounting adjustments, subject to the modifications specified in the Louisiana Corporation Income Tax law. LSA-R.S. 47:287.65.

. See 1986 La.Acts, 1st Ex.Sess., No. 16 § 1, effective December 24, 1986. Although section 287.92 was amended by the legislature in 1992 and 1993, the changes do not affect the outcome of this case. Thus, it is unnecessary for us to identify which version of this statute applies in this case. See 1992 La.Acts, No. 1029, § 1; 1993 La.Acts, No. 690, § 1, effective June 21, 1993.

. Although section 287.95 was amended by the legislature in 1993, 1996, and 1998, the pertinent language in subsection F remained unchanged although the paragraph designations did change. See 1993 La.Acts, No. 690, § 1, effective June 21, 1993; 1996 La.Acts, No. 19, § 1; 1998 La.Acts, No. 2, § 1; 1998 La.Acts, No. 2, § 1; 1998 La.Acts, No. 26, § 1, effective June 24, 1998.

. In Adams v. J.E. Merit Construction, Inc., 97-2005 (La.5/19/98), 712 So.2d 88, the supreme court granted a writ of certiorari to determine whether the exclusivity provision of the Workers' Compensation Act, as it existed in 1994, precludes employees from recovering punitive damages from their employer under former Louisiana Civil Code article 2315.3 for exposure to hazardous or toxic substances in the course of their employment. In reversing the lower courts’ rulings, the supreme court held that the workers’ compensation exclusivity provision precluded employees from seeking punitive damages, overruling Billiot v. B.P. Oil Company. Adams v. J.E. Merit Construction, Inc., 712 So.2d at 89.

. Article I, § 8, cl. 3, of the United States Constitution, known as the commerce clause, authorizes Congress to regulate commerce among the several states. Despite this express grant of power to Congress, the United States Supreme Court has consistently held that this language contains a further, negative command, known as the dormant commerce clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject. Oklahoma Tax Commission v. Jefferson Lines, Inc., 514 U.S. 175, 115 S.Ct. 1331, 1335, 131 L.Ed.2d 261 (1995). A state tax will be upheld in the face of a commerce clause challenge so long as the tax is applied to an activity with a substantial nexus with the taxing state, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the state. Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977).
Net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing state forming a sufficient nexus to support the same. Northwestern States Portland Cement Company v. Minnesota, 358 U.S. 450, 79 S.Ct. at 359, 3 L.Ed.2d 421; see LSA-R.S. 47:31(3). In such a case, the net income tax on revenues derived from interstate commerce does not offend constitutional limitations upon state interference with such commerce. Northwestern States Portland Cement Company v. Minnesota, 358 U.S. 450, 79 S.Ct. at 362, 3 L.Ed.2d 421.

. The value or worth of the privilege of doing business in the taxing state need not be limited to the value of the tangible assets owned or used by the taxpayer therein, and it is well settled that a state may, within certain limits, measure or compute the amount of an excise or franchise tax upon a foreign corporation with reference to assets or income which would be immune to a direct property tax. Kansas City Southern Railway Company v. Reily, 135 So.2d at 918. A statute calling for a "method of allocation” which is "fairly calculated” to assign to the taxing state that portion of the net income, capital, or other item upon which the amount of the tax is based, and "reasonably attributable” to the business done there, meets any standards required by the due process clause of the United States Constitution. Kansas City Southern Railway Company v. Reily, 135 So.2d at 918.

. The Texas appellate court on remand made the following additional findings. The goal of Transco's tactics was to put financial pressure on American and other operators to induce them to waive their liability claims and agree to new contracts far more favorable to Tran-sco. Transco took unfair advantage of smaller companies with which it had business dealings. Transco used its economic muscle to place a chokehold on those who would not agree to more favorable contracts and by this financial pressure bullied them into submission. This scheme offends the public sense of justice and propriety. Many small companies were forced to comply with Transco's pressures in order to maintain their economic lives. American National Petroleum Company v. Transcontinental Gas Pipe Line Corporation, 9602, p. 2 (Tex.App.—Texarkana) (unpublished), vacated, 806 S.W.2d 301 (Tex.App.—Texarkana 1991).

. Transco’s stipulation was obviously accepted by Justice Gonzalez, who recognized in his dissenting opinion in American National Petroleum Company v. Transcontinental Gas Pipe Line Corporation, 798 S.W.2d 274, three possible scenarios concerning the actual damages possibly suffered by American as a result of Transco's actions: (1) Transco did not pay enough for the little gas that it purchased, (2) Transco did not purchase the amount of gas it would have if the gas balancing agreements had been honored, and (3) Transco did not purchase as much as it should have under the take-or-pay gas contract. Justice Gonzalez remarked that in each case, the damage was the profit American hoped to make from their take-or-pay gas contract with Transco. American National Petroleum Company v. Transcontinental Gas Pipe Line Corporation, 798 S.W.2d at 282.

. Of the punitive damage award, 44.3092 percent would be attributable to Louisiana, with the remainder being attributable to Mississippi.

. In light of this conclusion, we find it unnecessary to discuss the meaning of the phrase "prescribed by the secretary[/collector]” found in LSA-R.S. 47:287.95(F)(5) and 606(A)(l)(k), respectively.