# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 18, 2012

Lyle W. Cayce
Clerk

No. 11-30452

ARTHUR J. GALLAGHER & COMPANY; GALLAGHER BENEFITS
SERVICES, INCORPORATED,

Plaintiffs – Appellees

v.

CLAYTON L. BABCOCK; DENISE J. ALEXI; MARIE G. HARDOUIN;
KRISTY COPELAND,

Defendants – Appellants

CLAYTON L. BABCOCK,

Plaintiff – Appellant

v.

ARTHUR J. GALLAGHER & COMPANY,

Defendant – Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, GARZA, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

No. 11-30452

This diversity suit seeks money damages for breach of restrictive employment agreements under Louisiana law, presenting issues of their scope and the measure of damages.

## I

Arthur J. Gallagher & Co. ("Gallagher") provides insurance-related services throughout the country. Its subsidiary, Gallagher Benefits Services, Inc. ("GBSI"), handles Gallagher's employee-benefit insurance programs. In November 2003, GBSI purchased Babcock Consulting, Inc., a business owned by Louisiana insurance broker Clayton L. Babcock. Pursuant to the purchase agreement, Babcock received $1.8 million in cash and stock, plus $980,000 in "earn out," a figure based on profits generated by the book of business that he transferred.

In addition to the purchase agreement, Babcock signed an employment agreement. In it, he agreed—among other things—to work as a vice president for GBSI in New Orleans. Denise J. Alexi and Marie G. Hardouin, two of Babcock's former employees, followed him to GBSI. In January 2005, Babcock added Kristy Copeland to GBSI's staff.

As part of their agreements with GBSI, Babcock, Alexi, Hardouin, and Copeland (collectively, "Defendants") each agreed to restrictive covenants. Babcock's were contained in his purchase and employment agreements, the others signed executive agreements limiting their non-GBSI employment. Between December 2007 and January 2008, Defendants left GBSI for Ellsworth Corporation, one of Gallagher's competitors. Thirteen of Gallagher's Louisiana clients—former clients of Babcock Consulting, Inc.—followed Defendants to Ellsworth.

Gallagher and GBSI (collectively, "Plaintiffs") filed a civil suit for injunctive relief and damages in the Eastern District of Louisiana and moved for

2

No. 11-30452

a preliminary injunction.[1] Plaintiffs argued, among other things, that the agreements signed by Defendants contained covenants not to compete. The district court found the provisions unenforceable because they were geographically overbroad—purporting to cover every parish in Louisiana. On appeal, we disagreed, holding that the agreements were not *per se* overbroad merely because they named every Louisiana parish.[2] We vacated the district court's judgment and remanded for further proceedings, including a consideration of the nature and scope of Gallagher's business in Louisiana.

On remand, the district court concluded that, while the purchase, employment, and executive agreements contained valid and enforceable non-competition and non-solicitation clauses, they reached beyond the geographic scope of Gallagher's relevant business—nine parishes should have been covered, not every parish in Louisiana as claimed. The court therefore limited the application of the restrictive covenants to the nine parishes where Gallagher provided employee-benefit insurance services.[3]

A two-day jury trial followed. After Plaintiffs stipulated that subsidiary GBSI alone would receive damages and attorneys' fees, the court dismissed the parent company as a plaintiff. It then granted judgment as a matter of law to GBSI on the issue of breach of the non-competition provisions, entered a directed verdict of liability against all four Defendants, and submitted the issue of damages to a jury, which awarded $1.2 million in damages and $310,000 in attorneys' fees.

---

[1] It also removed to federal court a declaratory judgment action filed by Babcock in Louisiana state court.

[2] *Arthur J. Gallagher & Co. v. Babcock*, 339 F. App'x. 384 (5th Cir. 2009), *cert. denied*, 130 S. Ct. 1092 (2010).

[3] *Arthur J. Gallagher & Co. v. Babcock*, Nos. 08-290, 08-185, 2011 WL 121891 (E.D. La. Jan. 10, 2011).

No. 11-30452

Defendants appealed. They claim that the district court erred by (1) finding that their contracts contained valid and enforceable non-competition provisions; (2) directing a verdict of liability against them; and (3) admitting certain testimony regarding Plaintiffs' damages. They further contend that the jury (4) awarded damages in an amount unsupported by the evidence; and (5) erroneously, or at least excessively, awarded attorneys' fees. Plaintiffs disagree, and claim additional attorneys' fees incurred in defending this appeal.

We affirm the district court's directed verdict on the breach of competition agreement, but set aside the damages. We conclude that the district court abused its discretion in admitting certain evidence on the issue of damages.[4] We must in turn vacate the award of attorneys' fees, leaving the ultimate award to be decided on remand.

## II. The Restrictive Covenants

Defendants argue that their employment agreements do not contain valid and enforceable non-competition provisions, both because of (1) their language and (2) their geographic scope. We are not persuaded.

We review *de novo* the enforceability of a contract as a matter of law.[5] In Louisiana, the words of a contract "are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning,"[6] and, "[w]hen [they] are clear and explicit and lead to no absurd consequences,"[7] no further search for intent is required.

---

[4] We do not reach the contention that the award lacked evidentiary support.

[5] *Team Envtl. Servs., Inc. v. Addison*, 2 F.3d 124, 126 (5th Cir. 1993); *see also Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003) ("The determination of whether a contract is clear or ambiguous is a question of law.").

[6] *Cadwallader*, 848 So.2d at 580 (citing LA. CIV. CODE ANN. art. 2047).

[7] LA. CIV. CODE ANN. art. 2046.

No. 11-30452

Restrictive covenants, such as non-competition and non-solicitation agreements, are narrowly construed under Louisiana law.[8] The governing statute is La. R.S. 23:921, which provides in relevant part:

> A. (1) Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void. However, every contract or agreement, or provision thereof, which meets the exceptions as provided in this Section, shall be enforceable.
>
> * * *
>
> C. Any person . . . who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment.

The Purchase Agreement by which Clayton Babcock sold the business book of Babcock Consulting, Inc. to Gallagher includes Section 7(f), entitled "Non-Competition," which states:

> For a period of two years . . . after the date of the termination of his employment with Gallagher or any of its subsidiaries . . . Babcock will not, directly or indirectly, solicit, serve, sell to, divert, receive or otherwise handle insurance-related business with any individual, partnership, corporation or association that (a) is, or within the last two (2) years was, a client or customer of [Babcock Consulting] or (b) is a prospective client or customer of [Babcock Consulting] in those parishes and municipalities designated on Addendum II attached hereto.

---

[8] *See SWAT 24 Shreveport Bossier, Inc. v. Bond*, 808 So.2d 294, 298 (La. 2001).

No. 11-30452

Babcock's Employment Agreement, Section 8, entitled "Protection of Corporation's Business," provides that Babcock:

> understands and agrees that for a period of two (2) years following the termination of this employment for any reason whatsoever, he will not, directly or indirectly, solicit, place, market, accept, aid, counsel or consult in the renewal, discontinuance, or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services or other insurance administrative or service function for, any Corporation account for which he performed any of the foregoing functions during the two year period immediately preceding such termination in those parishes and municipalities designated on Addendum II attached hereto.

The Executive Agreement signed by Alexi, Hardouin and Copeland, Paragraph 14, entitled "Post-Employment Obligations of the Parties," provides that the employee:

> understands and agrees that for a period of two years following the termination of his employment for any reason whatsoever, he will not (i) directly or indirectly solicit, place, market, accept, aid, counsel or consult in the renewal, discontinuance or replacement of any insurance or reinsurance by, or handle self-insurance programs, insurance claims or other insurance administrative functions ("insurance services") for, any Company account or actively solicited prospective accounts for which he performed any of the foregoing functions during the two-year period immediately preceding such termination or (ii) provide any employee benefit brokerage, consulting, or administrative services in the area of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products, and all other employee benefit areas ("benefit services") the Company is involved with, for any Company account or actively solicited prospective accounts for which he performed any of the foregoing functions within the

6

No. 11-30452

> Acquired Business Area during the two-year period immediately preceding such termination. . . . The term "Acquired Business Area" shall mean those parishes and municipalities designed on Exhibit A attached hereto.[9]

Addendum II/Exhibit A, referenced in the agreements, listed all 64 parishes of the state of Louisiana.[10]

**1**

Defendants argue that the agreements only prohibit solicitation or, alternatively, that combining non-competition and non-solicitation language created a restriction not permitted by La. R.S. 23:921.

The agreements unambiguously prohibit Defendants from competing against Gallagher or soliciting its clients for two years after the termination of their employment. Defendants agreed not to "solicit" certain of Gallagher's existing and prospective clients. And they agreed they would not "serve," "sell to," "market," "accept," "aid," "consult," "place," "counsel" or "consult" regarding insurance-related services with customers (or prospective customers) of Gallagher on whose accounts they had worked while employed by Gallagher. We are not convinced that these other phrases are merely types of solicitation, as Defendants contend. Nor do we believe that "solicit" is any more specific than "accept," "market," or "counsel"; accordingly "solicit" does not control our interpretation of those terms. Instead, these words all identify particular types of competitive behavior. Furthermore, the titles of the sections of the contract in which these provisions were contained—"Non-Competition," "Protection of

---

[9] The Agreements specify that they are between Gallagher and its subsidiaries, divisions and affiliated and related companies, collectively referred to in the agreement as the "Company."

[10] Although Exhibit A was not physically attached to Copeland's agreement, she is bound by its terms. *See L & A Contracting Co. v. Ram Indus. Coatings, Inc.*, 762 So.2d 1223, 1234 (La. Ct. App. 2000) ("As a general rule of contract law, separate documents may be incorporated into a contract by attachment or reference thereto.").

No. 11-30452

Corporation's Business," and "Post-Employment Obligations"—signaled that the provisions barred more than mere solicitation.

Defendants further argue that, even if this language prohibits competition and not just solicitation, the provisions are invalid because Louisiana courts do not permit parties to combine non-competition and non-solicitation language. This claim is without merit. It appears that Louisiana courts have never invalidated a restrictive covenant governed by R.S. 23:921 on this basis.[11] To the contrary, they have upheld agreements using similar non-competition language, even when combined with non-solicitation provisions.[12]

In the alternative, Defendants argue that the particular manner in which the agreements combine non-competition and non-solicitation provisions has impermissibly created a new and broader kind of restriction than is allowed by Louisiana law. Section 23:921 allows non-competition agreements that prohibit a former employee from "carrying on or engaging in a business similar" to that of the employer, and allows non-solicitation agreements that prohibit a former employee from "soliciting customers of the employer."[13] The provisions in these agreements, Defendants point out, created a hybrid restriction prohibiting employees from, among other things, "accepting," "handling" or "servicing" certain of the employer's current and prospective customers. This is impermissible, they contend, because the Louisiana legislature has created an all-or-nothing system: an employer can forego imposing non-competition

---

[11] Courts have sometimes declined to enforce agreements with such language, but not on the ground that the agreements' mix of non-solicitation and non-competition language rendered them vague and ambiguous. *See Choice Prof'l Overnight Copy Serv., Inc. v. Galeas*, 66 So.3d 1216, 1217–18 (La. Ct. App. 2011); *Johnson Controls, Inc. v. Guidry*, 724 F. Supp.2d 612, 616 (W.D. La. 2010).

[12] *See, e.g.*, *Allied Bruce Terminix Co. v. Guillory*, 649 So.2d 652, 652–53 (La. Ct. App. 1994).

[13] La. R.S. 23:921(C).

No. 11-30452

restrictions on its employees, or can prohibit its employees from competing in the same business as the employer for up to two years. It may not do anything else, such as forbidding employees only from competing against the employer vis-a-vis certain of the employer's clients.

This argument finds no support in Louisiana law. Louisiana does, of course, restrict and narrowly construe non-competition agreements.[14] As the Louisiana Supreme Court has explained, this policy "is based upon an underlying state desire to prevent an individual from contractually depriving himself of the ability to support himself and consequently becoming a public burden."[15] But over time, the Legislature has broadened the kinds of non-competition agreements into which employers and employees may enter.[16]

The provisions at issue here are *less* restrictive than allowed under state law. Instead of preventing its former employees from engaging in a similar business, Gallagher prohibits employees from competing for accounts on which they actually worked while at Gallagher, a restriction perhaps uncommon, but not unenforceable.

Defendants' position would require employers seeking the protection of non-competition agreements always to impose the broadest available restrictions on their employees' future employment options, undermining the stated policy of R.S. 23:921. Defendants provide no support for their contention that R.S.

---

[14] *Green Clinic, L.L.C. v. Finley*, 30 So.3d 1094, 1097 (La. Ct. App. 2010) ("Noncompete agreements are considered to be in derogation of the common right and must be strictly construed against the party seeking their enforcement.").

[15] *SWAT 24*, 808 So.2d at 298.

[16] *See Green Clinic*, 30 So.3d at 1097–98 (noting that the state legislature amended Section 23:921 in response to the Louisiana Supreme Court's overly narrow interpretation of the statute in *SWAT 24*). The amendment became effective August 15, 2003, and therefore applies to the contracts in this case.

No. 11-30452

23:921 defines the only possible type of non-competition clause, rather than the outer limits of what employers and employees may restrict by contract.[17]

Finally, Defendants claim the non-competition clauses are too ambiguous to be enforced, pointing to language such as "prospective" customers and "actively solicited prospective" accounts; categories, Defendants contend, that suffer impermissibly ambiguous scopes. Because Defendants raise this argument for the first time on appeal, it is forfeited. But even if considered, the argument would fail. First, these agreements apply only to *some* "prospective" customers, e.g., "actively solicited prospective accounts" on which certain defendants actually worked. Second, Defendants overlook the agreements' severability clauses. Regardless of whether restrictions on "prospective" customers are enforceable, here, Defendants worked on thirteen *existing* accounts. We therefore turn to the geographic scope of these non-competition agreements.[18]

---

[17] Defendants rely on inapposite cases. *See, e.g.*, *SWAT 24*, 808 So.2d at 308; *Choice Prof'l Overnight Copy Serv.*, 66 So.3d at 1220–21; *Vartech Sys., Inc. v. Hayden*, 951 So.2d 247 (La. Ct. App. 2006); *Guidry*, 724 F. Supp.2d at 612.

[18] Defendants also argue, for the first time on appeal, that Plaintiffs should be judicially estopped from claiming that the agreements at issue contain non-competition provisions. Defendants' argument comes too late, *see Nunez v. Allstate Ins. Co.*, 604 F.3d 840, 846 (5th Cir. 2010), and proves too little.

Judicial estoppel is an equitable doctrine, invoked at the court's discretion, that is designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment. *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001). Louisiana and the Fifth Circuit apply this doctrine only if the party's position is clearly inconsistent with its position in a previous case, and if the court accepted the party's previous position. *See Miller v. Conagra, Inc.*, 991 So.2d 445, 452 (La. 2008) (citing *In re Superior Crewboats, Inc.*, 374 F.3d 330, 335 (5th Cir. 2004)).

Defendants argue that Gallagher's position in *Arthur J. Gallagher Risk Mgmt. Servs., Inc. v. Todd*, 39 So.3d 856 (La. Ct. App. 2010), justifies estoppel. In *Todd*, a Gallagher employee allegedly attempted to solicit clients away from Gallagher in violation of his employment agreement. That agreement contained virtually identical language as the executive agreements at issue in this case. On appeal in *Todd*, Defendants argue, Gallagher claimed that the agreement prohibited solicitation rather than competition.

10

No. 11-30452

**2**

The district court found that the non-competition clauses, though otherwise enforceable, were geographically overbroad as written. It therefore relied on the agreements' severability clauses, reducing the number of parishes to which the non-competition provisions applied.

Under Louisiana law, non-solicitation and non-competition clauses must be limited to geographic areas in which the employer conducts "a like business," and the agreement must make this limitation clear by specifying the "parish or parishes, municipality or municipalities, or parts thereof" in which the employer operates.[19]  A court may, however, rely on a contractual severability clause to excise the geographic areas in which an employer does not conduct such business.[20]

The agreements in this case incorporated the geographic limitations of "Addendum II" and "Exhibit A," which named all sixty-four of Louisiana's parishes.  Before the district court, Defendants contended this scope was overbroad.  They pointed out that Defendants worked for Gallagher subsidiary GBSI, providing life and health insurance services as part of the company's employee-benefit program.  Gallagher provided life and health insurance

---

We do not agree that Gallagher should be estopped from arguing that the provisions at issue here contain non-competition agreements based on its position in *Todd*. First, in *Todd*, Gallagher sought only to demonstrate that Todd had solicited its clients; competition was not at issue.  Second, and more importantly, the court did not adopt Gallagher's argument that the clause prohibited only solicitation (rather than both solicitation and competition).  Its decision was based on Gallagher's failure to provide sufficient evidence showing that Todd had engaged in active solicitation.  Accordingly, judicial estoppel is not appropriate here.

[19] La. R.S. 23:921(C); *see also Aon Risk Servs. of La., Inc. v. Ryan*, 807 So.2d 1058, 1060 (La. Ct. App. 2002); *Team Envtl. Servs., Inc.*, 2 F.3d at 126.

[20] *See, e.g.*, *Dixie Parking Serv., Inc. v. Hargrove*, 691 So.2d 1316, 1320 (La. Ct. App. 1997) (discussing the Louisiana Supreme Court's reversal of *AMCOM of La., Inc. v. Battson*, 666 So.2d 1227 (La. Ct. App. 1996)).

No. 11-30452

services in only nine parishes, so, the argument went, the agreement should have been limited to those areas. Gallagher responded that specifying all sixty-four parishes was proper because the company provides insurance services in each one.

The district court agreed with Defendants and eliminated the fifty-five parishes in which Gallagher did not provide life and health insurance services. This was not error. We have already made clear that these provisions were not invalid merely because they attempted to reach every Louisiana parish.[21] Similarly, Defendants may not defeat restrictions on competition in these nine parishes by showing that the restrictions were not enforceable in other parishes.[22]

Defendants contend that Gallagher's naming all sixty-four parishes was so egregious that it renders the covenant invalid as to all sixty-four parishes instead of just the fifty-five as noted by the district court. This argument is not without force. But, at minimum, listing all sixty-four parishes, unlike claiming a geographic scope of "anywhere the employer does business," makes clear to employees that they are being asked not to compete anywhere within the State of Louisiana.[23] And Defendants suggest no principled way to determine how many stricken parishes is "too many" to leave valid, remaining parishes unaffected. As do Louisiana's courts, we decline to authorize such collateral attacks.

---

[21] *Babcock*, 339 F. App'x at 387.

[22] *Cf. Vartech Sys., Inc.*, 951 So. 2d at 258 and n.14.

[23] *Cf. Aon Risk Servs.*, 807 So.2d at 1062 ("By specifying the parishes, etc. and requiring that the employer be doing business in them, the employee is not later caught in a position where he finds that he has given up much more than he bargained should his employer greatly expand the geographic range of his business after the agreement is executed.").

12

No. 11-30452

### III.  Directed Verdict

We review *de novo* a district court's grant of a directed verdict, applying the same standard as the district court.[24]  A directed verdict is appropriate after a party has been fully heard on an issue and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.[25]  The facts are viewed, and all reasonable inferences made, in the light most favorable to the non-movant.[26]

The contracts, as we have explained, contained valid and enforceable non-competition clauses prohibiting Defendants from providing insurance services to clients on whose accounts they worked while at Gallagher.  As Plaintiffs point out, and Defendants do not contest, Defendants admitted at trial that they had worked on the thirteen disputed client accounts while at Gallagher, and then handled those same clients for Ellsworth in the same parishes in which they had serviced them for Gallagher.  Given this admission, a reasonable jury could not have found in favor of Defendants on the issue of breach.  We affirm the district court's directed verdict.

### IV. Proof of Damages

Defendants next challenge the jury's award of $1.2 million dollars in damages. They argue that the district court abused its discretion by admitting the evidence proffered by John Caraher, Gallagher's chief financial officer.

---

[24] *See Becker v. PaineWebber, Inc.*, 962 F.2d 524, 526 (5th Cir. 1992).

[25] FED. R. CIV. P. 50(a)(1); *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008).

[26] *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1421 (5th Cir. 1993).

No. 11-30452

Caraher provided the jury with two different estimates of GBSI's "lost profits" resulting from the breach.

Admissibility lies within the sound discretion of the district court, whose evidentiary rulings we review only for an abuse of discretion.[27] Expert opinion evidence must be based on reliable principles and methods, and assist the trier of fact.[28]

Under R.S. 23:921, an employer is entitled "to recover damages for the loss sustained and the profit of which he has been deprived" as a result of a former employee's breach of a non-competition or non-solicitation agreement.[29] To measure lost profits, the trier of fact should consider net loss, or gross profit minus expenses.[30] Such damages may not be based on speculation or conjecture, but must be proven with "reasonable certainty."[31] "In cases where direct evidence is not available to establish the exact extent of loss caused by a breach of contract, resort to customary or foreseeable profit as a measure of damages is proper."[32] The ultimate goal of such compensatory damages is "to put the plaintiff in the same economic position it would have been in had the contract

---

[27] *Jon-T Chemicals, Inc. v. Freeport Chemical Co.*, 704 F.2d 1412, 1417 (5th Cir. 1983).

[28] FED. R. EVID. 702.

[29] La. R.S. 23:921(H). This language mirrors that of LA. CIV. CODE ANN. art. 1995.

[30] *La. Smoked Prods., Inc. v. Savoie Sausage & Food Prods., Inc.*, 673 So.2d 248, 254 (La. Ct. App. 1996), *aff'd in part*, 696 So.2d 1373 (La. 1997).

[31] *Simpson v. Restructure Petroleum Mktg. Servs., Inc.*, 830 So.2d 480, 484 (La. Ct. App. 2002).

[32] *White Haute, LLC v. Mayo*, 38 So.3d 944, 952 (La. Ct. App. 2010).

14

No. 11-30452

been fulfilled as planned."[33] The plaintiff has the burden of proving damage and its amount.[34]

The jury heard evidence on the issue of damages from John Caraher, Gallagher's chief financial officer and a CPA. The court admitted his testimony, stating:

> I'm going to qualify the witness as an expert in the field of accounting. To the extent that he valued the business, he can testify as a fact witness subject to cross-examination. The jury can determine whether or not the methodology he used in calculating the value of this business on behalf of his employer was valid or not.

Caraher testified that GBSI sustained losses between $1,301,343 and $2,876,000 as a result of Defendants' breach of contract. In estimating these losses, Caraher relied on formulas similar to those he uses when valuing a business that Gallagher is considering buying, on the basis that the value of a business is tied directly to the profits it will generate. He presented two calculations to the jury for purposes of estimating the lost profits.

Caraher calculated GBSI's lost profits based on what the fair selling price of GBSI's partial book of business would have been had Babcock sought to re-purchase the client relationships GBSI lost as a result of Defendants' breach. To do this, Caraher looked at the average annual profits earned by Babcock's group for the three years preceding Defendants' departure, then subtracted the profits earned from the clients that remained with GBSI after Defendants' departure. The remainder was the annual average profits earned by GBSI from the lost clients. Caraher multiplied that number by 6.5, the approximate

---

[33] *Crawford v. Am. Nat'l Petroleum Co.*, 805 So.2d 371, 381 (La. Ct. App. 2001).

[34] *Jackson v. Lare*, 779 So.2d 808, 814 (La. Ct. App. 2000).

No. 11-30452

number of years any particular client remains with GBSI. The final number was $2,699,552.

Caraher also estimated lost profits by calculating what the expected investment return was for GBSI when it entered into its purchase agreement with Babcock in 2003. To do this, Caraher looked at the profit margins GBSI expected over ten, thirteen, and fifteen years based on the new book of business it acquired from Babcock Consulting, since GBSI generally retains clients for ten to fifteen years following a merger. The calculation assumed that profits from existing clients would diminish gradually over time as those clients left GBSI. From the resulting number, Caraher subtracted profits actually made by GBSI from the purchase agreement until January 1, 2008, since the Defendants were still employed at Gallagher during that time. Caraher also subtracted expected profits on business retained by GBSI after Defendants left. In projecting what profits GBSI would have made after 2008 had Defendants not breached their contracts, Caraher used GBSI's New Orleans office's 2007 profit margin of 38.9%. The final estimation was that over the fifteen-year period, GBSI would suffer $2,876,008 in lost profits, over the thirteen-year period $1,952,015 in lost profits, and over the ten-year period $1,301,343 in lost profits.

The jury ultimately awarded $1.2 million in damages. The jury interrogatory did not ask the jury to identify which of those damages arose from clients GBSI lost to others than Defendants. Rather, the jury was asked: "What amount, if any, do you find will fairly and adequately compensate the plaintiff, Gallagher Benefits Services, Inc., for the total damages it suffered[?]" The amount of the award indicates that the jury likely adopted the ten-year calculation in Caraher's second calculation and made some downward adjustments. The parties' arguments, appropriately, focus on this second calculation.

16

No. 11-30452

At least two of Defendants' contentions are without merit. First, Defendants claim that Caraher should have based his calculation of lost profits on the amount of net profits actually earned by Ellsworth on the thirteen clients who followed Defendants from GBSI to Ellsworth, rather than on the amount of profits GBSI expected to earn from those clients. But the amount of profits *lost by Plaintiffs* does not need to equal the amount of profits *gained by Defendants*. If Plaintiffs would have obtained greater profits (in the absence of a breach) than the Defendants actually did (as a result of the breach), Plaintiffs are entitled to those larger profits.[35] Louisiana courts, moreover, permit projections of future profits to be used as evidence of lost profits, so long as there is a reasonable basis for making those projections, such as the business's past performance.[36] Courts recognize that there remains an inherent degree of speculation in such projections, but that they are not so speculative or conjectural as to be inadmissible when calculating the damages owed by the party whose failure to perform was the cause of the damages' speculative nature.[37]

Second, Defendants claim Caraher erred by calculating lost profits based on the New Orleans's office's 2007 profit margin of 38.9%, rather than on its much lower 2008 profit margin of 13.1%. They likewise claim Caraher erred by using GBSI's historical retention rates, instead of the retention rates actually experienced in the New Orleans office after Defendants left in 2008. These arguments are also unavailing. Plaintiffs explain that Caraher did not use the

---

[35] *See, e.g.*, *Woodward v. Steed*, 715 So.2d 629, 631 (La. Ct. App. 1998).

[36] *See, e.g.*, *Smith v. Shirley*, 815 So.2d 980, 986–87 (La. Ct. App. 2002); *A&W Sheet Metal, Inc. v. Berg Mech., Inc.*, 653 So.2d 158, 163 (La. Ct. App. 1995); *but see Mayo*, 38 So.3d at 952–53 (disallowing an award for lost future profits where the plaintiff presented no evidence of the business's past performance).

[37] *See ScenicLand Const. Co. v. St. Francis Med. Ctr., Inc.*, 936 So.2d 247, 252–53 (La. Ct. App. 2006); *Weeks v. T.L. James & Co.*, 626 So.2d 420, 426 (La. Ct. App. 1993).

No. 11-30452

13.1% profit margin or the post-2008 retention rate because Defendants' breach almost certainly deflated those numbers. Those numbers, in other words, likely do not reflect what GBSI would have earned if Defendants had not breached.

Defendants' next argument, however, exposes a critical flaw in Caraher's methodology. Caraher estimated the profits that GBSI would have made from Babcock's book of business. He then subtracted the profits that GBSI expected to make from clients that GBSI retained. This calculation reduced the lost-profit projection to clients who left GBSI after the breach. The problem is that the group of clients who *chose to leave* is not the same as the group of clients *who followed Defendants to Ellsworth*. Of the nineteen clients who left GBSI, only thirteen followed Defendants.[38]

Plaintiffs contend that Defendants' breach caused the six remaining clients to depart, and that Defendants are therefore responsible for GBSI's loss of their business. Plaintiffs hypothesize, for example, that the specter of litigation attending Defendants' breach spooked their otherwise loyal customers. This is too speculative and conjectural to support an award of damages. Caraher testified that GBSI expects to lose clients every year, and provided no specific evidence regarding why these six clients decided to go to a new broker after Defendants' departure.[39] Defendants did not breach their agreements by *leaving* GBSI, but by *accepting work* from clients who departed along with them.

---

[38] Defendants preserved this error by objecting after their voir dire of Caraher. *See* FED. R. EVID. 103(a)(1)(B) (noting that ground for objection need not be stated if apparent from context). Although Defendants allowed Caraher's report to be labeled a joint exhibit and did not object at trial to its admission, they did not "introduc[e the] evidence" at issue here. *Cf. Ohler v. United States*, 529 U.S. 753, 755 (2000) (noting that, in general, "a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted").

[39] This decision may, for example, have been made for reasons completely unrelated to Defendants' departure, or because they did not have a business relationship with or confidence in the staff remaining at GBSI after Defendants' departure.

No. 11-30452

Because Defendants are not responsible for GBSI's other lost clients, we hold that the district court abused its discretion by permitting Caraher to testify about an irrelevant theory of damages. We therefore vacate the $1.2 million damages award and remand to the district court for further proceedings.[40] Defendants argue the jury's award was unsupported by the evidence proffered or, in the alternative, excessive. Because we vacate the award due to the error in admitting a critical portion of Caraher's testimony, we do not consider this issue.

## V. Attorneys' Fees

Having vacated the damages award, we likewise vacate the award of attorneys' fees for reassessment. Plaintiffs-appellees seek an order requiring Defendants to pay all of the attorneys' fees that Plaintiffs incurred in defending this appeal. Because Plaintiffs were only partially successful in their defense of the judgment below, we decline to award fees at this juncture. We leave to the district court on remand the matter of whether such fees ought be awarded and their amount.

* * *

We AFFIRM the judgment insofar as it directs a verdict against the Defendants. We VACATE the awards of damages and attorneys' fees and REMAND this case to the district court for further proceedings.

---

[40] Defendants also argue that they may not be held liable for losses sustained after the non-competition provisions expired; i.e., for losses sustained more than two years after their departure. We need not, however, and do not resolve that issue now.